The PILLSBURY COMPANY, Illinois Central Gulf Railroad Company, Burlington Northern Railroad Company, and ConAgra, Inc.

v.

MIDLAND ENTERPRISES, INC.; Orgulf Transport Company; and the M/V ROBERT N. STOUT, her tackle, etc., in rem.

Civ. A. No. 87–5041.

United States District Court, E.D. Louisiana.

June 21, 1989.

John F. Fay Jr., T.A., and Elizabeth L. Rue, O'Neil, Eichin, Miller & Breckinridge, New Orleans, for plaintiffs.

Fred E. Salley, T.A. and Stephen M. Wiles, Salley & Associates, New Orleans, for defendants.

## OPINION

PATRICK E. CARR, District Judge.

This matter was tried before the Court sitting without a jury on Thursday–Friday, April 27–28, 1989. Having considered the evidence, the record, the arguments of counsel, and the applicable law, the Court now rules as follows. To the extent any of the following findings of fact constitute conclusions of law, the Court adopts them as such; to the extent any of the following conclusions of law constitute findings of fact, the Court adopts them as such.

This is a maritime property damage case under Rule 9(h). On October 28, 1986, defendants' vessel the M/V ROBERT N. STOUT picked up thirteen loosely-rigged barges in the Chain of Rocks Canal near St. Louis, Missouri. Without first having his crew completely tighten. the rigging, the captain proceeded down the canal and into the Mississippi River, where eleven of these barges soon broke away in an unexpected current. One or more of these barges struck and severely damaged two of plaintiffs' marine structures in the river, namely, a mooring cell at the ICG/Peabody facility and a mooring dolphin at the Pillsbury Sauget facility. Plaintiffs seek to recover the replacement costs for these two structures, as well as certain incidental expenses relating to the damage.

### I.

#### A. The parties

Plaintiffs in this action are The Pillsbury Company, Illinois Central Gulf Railroad Company (ICG), Burlington Northern Railroad Company, and ConAgra, Inc.

At all material times, ICG and Burlington Northern were and still are the owners of a barge loading facility commonly referred to as the ICG/Peabody facility or Peabody Coal Dock, which is located in East St. Louis, Illinois on the left descending (east) bank of the Mississippi at about UMR Mile 179.2 (i.e., Mile 179.2 of the Upper Mississippi River). At all material times up to January 31, 1989, this facility was under lease to Pillsbury. At issue in this matter is the northern, or upriver,

most mooring structure located in the river at this facility, namely, a mooring cell.

At all material times, Riverport Terminal and Fleeting Company was and still is the owner of another barge loading facility further downriver and commonly referred to as the Pillsbury Sauget facility, which is located in Sauget, Illinois on the left descending bank of the Mississippi at about UMR Mile 177.6. At all material times up to January 31, 1989, this facility also was under lease to Pillsbury. At issue in this matter is the northern, or upriver, most mooring structure located in the river at this facility, namely, a mooring dolphin.

On January 31, 1989, Pillsbury sold its grain merchandising division of about forty facilities to ConAgra, Inc. Included in this sale was Pillsbury's interest in these two facilities and in all assets thereon. As part of the sale, Pillsbury and ConAgra entered into a three-page ratification agreement concerning the mooring cell, the mooring dolphin, and this litigation; following a preamble, the agreement provides in whole as follows:

1. Pillsbury hereby retains the obligation to restore the above-described marine dolphin and cell to a condition so as to be in compliance with Pillsbury's repair and maintenance obligations under the applicable leases.

2. ConAgra hereby (1) ratifies the [instant] civil action instituted by Pillsbury, Burlington and Illinois for the recovery of damage to the marine dolphin at the Sauget Terminal and the marine cell at the ICG facility, (2) agrees to be bound by the decision of the United States District Court for the Eastern District of Louisiana in that action, and (3) forever waives any right it had, has or may have to pursue claims for damage to the above-described mooring dolphin and cell contained in the [instant] action instituted by Pillsbury, Burlington and Illinois. ConAgra further agrees that all sums recovered by Pillsbury, Burlington and Illinois relating to damage to the mooring dolphin and cell shall be retained by those parties.

Pillsbury hereby agrees to indemnify and hold ConAgra harmless from any and all damages, losses, costs or expenses it may suffer or incur which in any way result from the [instant] action instituted by Pillsbury, Burlington and Illinois including, without limitation, damages, losses, expenses or costs incurred as a result of any counterclaim(s) or crossclaim(s) filed in said action.

According to S. Vincent O'Brien, formerly with Pillsbury and now with ConAgra and who participated in the sale negotiations and closing, this ratification agreement is the sole agreement concerning these two facilities, other than the general sale agreement.[1]

Defendants in this action are Midland Enterprises, Inc. and one of its subsidiaries, Orgulf Transport Company, *in personam* and the M/V ROBERT N. STOUT *in rem*. Both Midland and Orgulf admit that at all material times they were and still are

---

**1.** Upon the Court's admission of this document, defense counsel moved for a mistrial and on cross-examination of O'Brien moved for production of all other documents relative to the sale, both on grounds that plaintiffs should have provided all these documents earlier. The Court denied both motions. First, by at least April 10, 1989, defense counsel was aware of the sale between Pillsbury and ConAgra, for it was he who brought up the issue of sale documents at the Court's conference to select a new trial date; the record does not reveal, however, that he ever made a written request for any such documents under F.R.Civ.P. 34 (or even an informal, unwritten request) or that he ever moved the Court before the morning of trial to order the production of any such documents. Second, defense counsel tendered this very document in support of his motion in limine to dismiss for lack of standing and has not otherwise shown prejudice by the document's admission. Third, it is most remote that any documents beyond the one in evidence would be relevant to the instant matter. Defense counsel suggests that other documents may reveal a dollar-figure used between Pillsbury and ConAgra for the two structures; to the extent such might be true, the Court would likely put little, if any, weight on such figures in light of the overwhelmingly more indicative testimony of the parties' engineering experts on the value of these structures. In this connection, defense counsel has offered no authority or suggestion that any valuation of these two structures set in the multi-million dollar sale between Pillsbury and ConAgra would be a reliable figure for determining the extent of damages to the two structures.

doing business in this district. The vessel was never served or arrested, nor was a letter of undertaking, a notice of claim of owner, or any similar formal stipulation filed into the record; further, there is no evidence that the vessel was ever within the Eastern District of Louisiana during the pendency of this action. The pretrial order includes no mention of the vessel as one of the defendants before the Court. In two early, unverified documents in the record, however, defense counsel represented that they were appearing on behalf of not only Midland and Orgulf, but also the vessel itself.[2]

The ROBERT N. STOUT is a steel hull push boat (tug) measuring 152.5 feet long and 45 feet wide. It is equipped with two diesel engines and Kort nozzles that generate a total power of about 7,200 horsepower. The vessel is among the largest towing vessels on the Upper Mississippi. At all material times, Midland owned and Orgulf operated the vessel, which was in good operating condition.

### B. *The breakup*

On Tuesday, October 28, 1986, the Mississippi River in the St. Louis area was at a river stage between 29 and 30 feet and rising. Under this near flood-stage condition,[3] the river current, especially for the topwater, is faster than normal and lateral sets, or drafts or shears, are generally stronger.

On that same date, the ROBERT N. STOUT was under the command of Orgulf's employee Captain Jimmy Wolfe, a Coast Guard licensed river captain and pilot with over thirty years experience primarily on towing vessels. He was fully aware of the river condition that day. From around noon to 6 p.m., he was off-shift. During this period, the vessel proceeded up the Mississippi River through the St. Louis Harbor, then up the adjoining Chain of Rocks Canal (commencing at UMR Mile 184.1), through its lower-most lock (viz., Lock No. 27 at UMR Mile 185.5), and into the forebay (the northern, or upcanal, side) of the lock in order to exchange tows with another Midland/Orgulf vessel, the OMEGA, which had come southbound down the same canal.

The STOUT was to pick up the OMEGA's thirteen, fully loaded, unmanned, river hopper barges, which ranged from 195 to 200 feet long by 35 feet wide. These barges were joined three abreast by four deep, with a single lead, or spike, barge extending off the front of the group of twelve; together, the STOUT and tow had a total length of 1141 feet and a total width of 105 feet. According to Captain Wolfe, the odd barge was spiked, and not lashed abreast the other barges, in order that the tow could pass through the narrow locks. There were no lateral support, or wing, wires running from either the bow or the side of the spike barge to any of the other barges. Because of their lack of stability, especially without wing wires, Captain Wolfe prefers not carrying spike barges.

At some time during his off-shift and while these thirteen barges were still in the OMEGA's control, Captain Wolfe went for an afternoon exercise walk. During this long walk, he passed over both the STOUT's original tow and the OMEGA's original tow. He noticed that a significant portion of the rigging on the tow coming from the OMEGA to the STOUT was improperly rigged;[4] specifically, he observed

---

**2.** *See* Answer to Complaint of Intervention, R.Doc. 21; Motion for Partial Summary Judgment, R.Doc. 22.

**3.** According to records of the United States Army Corps of Engineers, flood stage at the river gauge at UMR Mile 179.6 occurs at 30 feet. *See* Exh. P–6; *see also Petition of M/V Elaine Jones,* 480 F.2d 11, 16 (5th Cir.1973), *modified on other grounds,* 513 F.2d 911 (5th Cir.), *cert. denied sub nom. Griffith v. Canal Barge Co.,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975).

**4.** It is unclear exactly why the rigging was so loose. Captain Wolfe testified that the chamber in Lock No. 26, which is above (i.e., north, or upcanal, of) Lock No. 27, is only 600 feet long (as opposed to the chamber in Lock No. 27, which is 1200 feet long) and thus the thirteen-barge tow would have to have been divided into two groups for passing through Lock No. 26. While this evidence may explain why a small portion of the rigging was loose, the Court rejects this explanation for the sole reason why "quite a bit" of the rigging was loose; further, this evidence does not explain why the captain

that, contrary to normal procedure, the rigging was "quite a bit loose" and that the ratchets "were run all the way up" (i.e., not properly adjusted). Nonetheless, he apparently said nothing to anyone at that time about his observation.

After his walk, Captain Wolfe returned to the STOUT in order to eat his supper and to take a shower before his evening shift. According to the captain, the two vessels completed their tow exchange sometime during this period; according to the vessel log, the tow exchange was completed at 5:00 p.m.

At around 5:50 p.m. to 5:55 p.m., when the STOUT and its new tow were at or near the lockwall and waiting to enter Lock No. 27, the captain began his watch. Sometime before the vessels entered the lock, which according to the vessel log was at 6:30 p.m.,[5] his mate on duty approached him to advise him of the loose rigging on the new tow; only then did the captain order the mate and the two deckhands on duty to tighten the rigging as much as possible before the STOUT and tow reached the river.

According to Captain Wolfe, it was Orgulf's policy that a captain had the complete discretion to order that a tow be rerigged if he was dissatisfied with the tow's rigging condition. No evidence was introduced of any other, specific policies by Orgulf or Midland concerning the rigging of barges being towed by Orgulf captains on Midland vessels or otherwise. Other than by directing his crew to tighten the tow's rigging, Captain Wolfe apparently did not exercise any such discretion.

During the period when the vessels were entering, in, and exiting the lock—which operation according to the vessel log took a total of thirty minutes—the crew was unable, at least much of this time, to tighten the rigging because it had to handle lines for maneuvering the tug and tow into and out of the lock.

As soon as the tow reached the end of the canal, the captain blew his whistle for the crew to stop tightening the rigging and to return to the STOUT; according to the captain, it was his safety policy not to let crewmembers remain on tows during high river conditions. He never specifically asked whether the crew had completed the tightening operation; upon consideration at trial, however, he doubted that the crew would have had enough time to complete the entire tightening operation.

The water in the canal was relatively slack (i.e., still, calm, or without current) such that a vessel could safely complete a tow tightening operation.[6] Yet Captain Wolfe did not attempt to stop his tug and tow in the canal. At trial, he acknowledged that there was a danger that the barges might break up. But he added that he had believed the rigging was sufficiently tightened so that he could safely arrive at his destination at the Eagle Fleet facility, which is about five miles downriver from the canal.

The lockmaster has a general order in effect that vessels are not to stop in the canal without first seeking his permission; according to plaintiff's navigation expert, Captain Edgar Allen Poe, this order does not apply, however, to the bottom 1200 feet of the canal, where the canal is about 450 feet wide. Captain Wolfe never sought—indeed, never consciously thought of seeking—the lockmaster's permission to stop

on the OMEGA (or, through their policies on rigging, defendants' management in general) permitted any rigging on his tow to remain loose after passing through Lock No. 26.

5. Captain Wolfe testified that to his recollection, he entered the lock "a few minutes" after he came on watch. While the Court finds Captain Wolfe's testimony in general to be candid and credible, the Court finds the vessel log, Exh. P–16, to be more reliable and precise on this issue of timing. *See O/Y Finlayson–Forssa A/B v. Pan Atlantic Steamship Corp.,* 259 F.2d 11, 16 (5th Cir.1958) (citing *The Georgian,* 76 F.2d 550,

551 (5th Cir.1935)), *cert. denied,* 361 U.S. 882, 80 S.Ct. 153, 4 L.Ed.2d 119 (1959).

6. *See also Continental National American Group v. Valley Line Co.,* 420 F.Supp. 568, 569 (E.D.Mo. 1976) ("There is evidence that the water in the Chain of Rocks Canal is normally calm"); *cf. United States v. Green,* 246 F.2d 155, 158 (7th Cir.) ("the Chain of Rocks Canal ... had been built in order to overcome navigational difficulties in the Mississippi River"), *cert. denied,* 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957).

anywhere in the lock or canal in order to ensure that his crew could properly complete its tightening operation. He testified that he would have sought permission had he believed his tow was unsafe, but added that he did not believe his risk to be sufficiently large—especially in light of Orgulf's unwritten policy to keep its vessels moving whenever possible—to warrant seeking permission to stop, which might have interfered with the heavy northbound traffic around Lock No. 27 that day. Captain Wolfe acknowledged that he never knew of a time when the lockmaster denied any such request for safety reasons; according to Captain Poe, the lockmaster commonly receives and grants such requests during adverse travel conditions.

As soon as the tow reached the river, Captain Wolfe noticed through the dark the spike barge start "wiggling." This observation, which he termed a "cause for concern," led him in part to conclude, at least in the back of his mind, that the crew had in fact not finished tightening the tow's rigging. But he still did not attempt to stop the tug and tow, even though, as he acknowledged at trial, the STOUT had sufficient power to hold the tow still in the river so that the crew could have completed the tightening operation before he proceeded down the river. Instead, he decided that he should operate the STOUT at or below a slow bell (i.e., at a reduced engine power and thus at a reduced speed such that the vessel is travelling little faster, if any, than the river current) in order that the river could put less stress on the tow with its substandard rigging condition and spike barge. The captain would have preferred to have been able to push the tow at a higher speed down the river in this location—as he had done every other time he could recall—so that he could have more control over and maneuverability of both the tug and tow in avoiding the unwanted effects of drafts and currents in the high river.[7]

For the first three miles in the river, the tug and tow proceeded uneventfully; Captain Wolfe flanked the tow [8] just outside the canal and then, proceeding at slow bell, passed beneath the Merchants Railroad Bridge (UMR Mile 183.2) and the McKinley Highway and Railroad Bridge (UMR Mile 182.5) without incident. Around UMR Mile 181.0, however, Captain Wolfe began to notice an unexpected right-hand draft (i.e., water pushing on his port side and toward the Missouri bank). In his many years in travelling through the St. Louis Harbor in high waters and otherwise, Captain Wolfe had never experienced or heard of any right-hand draft in this location of the river. According to both Captain Wolfe and plaintiffs' navigation expert, Captain Poe, there is generally a left-hand draft in this portion of the river.[9]

To compensate for this right-hand draft, Captain Wolfe adjusted his direction and increased his speed in order that he could properly pass under the two approaching

---

7. Plaintiffs' navigation expert, Captain Poe, explained the reason for this phenomenon. The thrust of the water upon a vessel, and especially its rudder, is what guides the vessel; as the relative speed, and thus also the relative force, between the vessel and the water decreases, the thrust similarly decreases, thereby causing the vessel to have less ability to steer in the water.

8. To flank a tow means to aim the tow at an angle towards a riverbank and, with little or no engine power, to let the river current push the tug and the tow. *See also Union Oil Co. of California v. M/V Issaquena,* 470 F.2d 875, 876 (5th Cir.1973) ("the tow is diagonally across the channel and is proceeding at a very slow rate of speed"); *Crawford v. Indian Towing Co.,* 240 F.2d 308, 309 (5th Cir.) (the vessel "was flanking down the channel, that is to say, instead of moving in a straight course in relation to the axis of the channel, it was headed diagonally across the entire channel"), *cert. denied,* 353 U.S. 958, 77 S.Ct. 865, 1 L.Ed.2d 909 (1957).

9. *See also Elaine Jones,* 480 F.2d at 16 (describing the St. Louis Harbor in flood-stage river conditions); *Mid–America Transportation Co. v. Rose Barge Lines, Inc.,* 347 F.Supp. 566, 569 (E.D.Mo.1972), *aff'd,* 477 F.2d 914 (8th Cir. 1973). Captain Poe gave a perhaps simplified, but uncontradicted, explanation for the left-hand draft. At this portion of the river, the riverbed turns toward the right, or west. Being affected by gravity and inertia, however, the water tends to continue flowing in straighter line. Thus, vis-à-vis the riverbank, the current appears to veer toward the left, or east. It is this apparent change in the current that constitutes the normal left-hand draft.

bridges, first the Veterans Memorial Highway Bridge (now also known as the Martin Luther King Jr. Highway Bridge) (UMR Mile 180.2) and then the Eads Highway and Railroad Bridge (UMR Mile 180.0). As the vessels "came ahead," they were "out of shape" (i.e., were not facing the proper direction for passing beneath the two bridges). Thus, Captain Wolfe applied a starboard rudder. When it was turned about 10° to 15°, the tow suddenly broke apart just as the tow was passing beneath the Eads Bridge. The breakup occurred within a matter of seconds, which according to the vessel log was around 7:30 p.m. Captain Wolfe was unable to say exactly what portion of the tow broke first or exactly how many of the barges that broke away remained strung together. In total, however, eleven barges separated from the STOUT and freely drifted down the river.

Captain Wolfe attributes the breakup to three factors: the loose rigging, the high river, and the right-hand draft. Upon the Court's questioning, he acknowledged that he, like other riverboat captains, occasionally encounters unexpected river conditions, such as this apparent right-hand draft.

Captain Wolfe does not believe he did anything wrong to cause the breakup. Plaintiffs' navigation expert, Captain Poe, however, disagrees. He suggested that the Captain Wolfe was not experiencing a true right-hand draft, but instead was merely experiencing the normal current. As Captain Wolfe turned toward the Illinois riverbank in order to line his vessels up to pass beneath the two upcoming bridges, Captain Poe suggested, a greater portion of the port side of the STOUT and its tow was exposed to the current; in other words, just as Captain Wolfe had intentionally done when he flanked the tow just outside the canal, Captain Wolfe "created" the draft when he let his vessels become too out of line with the river current. Captain Poe appeared not to suggest that Captain Wolfe's miscalculation in steering the STOUT was alone negligent; Captain Poe expressed the opinion, how-

ever, that Captain Wolfe did not act as a prudent mariner when he proceeded down the river with the knowledge that his tow was loose and without having attempted to stop the vessel earlier in order to completely tighten the rigging on the tow (which tightening Captain Poe estimated could have been completed within 25 to 40 minutes). Indeed, Captain Poe characterized Captain Wolfe's overall conduct as "reckless," or "a little worse than imprudent."

On cross-examination, Captain Poe gave a credible explanation of the "physical" cause of the breakup. On the one hand, when a pushtug increases its speed and turns its rudder at about the same time, stress is unevenly placed on its tow; for example, as a pushtug first turns aport, the rigging wires on the port side of the tow become more taut and those on the starboard side loosen. On the other hand, barges in a tow with loose rigging tend to shift relative positions much more than they do if the rigging is tight, and spike barges without wing wires tend to place greater stress on the rigging further back in the tow. Thus, as Captain Wolfe applied a starboard turn to the tow that had just been veering aport, there was a quick change in stress points along the rigging on the tow. At some point, the stress became too great for the loose rigging, and the barges broke loose.

### C. The aftermath

After the breakup, Captain Wolfe attempted to round up what barges he could. He found one "laying crosswise off" the upriver most mooring structure [10] at the ICG/Peabody facility and another further downriver inside the Pillsbury Sauget facility. Another boat "pulled [the barge] off" one of the cells at Sauget, and Captain Wolfe then retrieved this barge, which had become in danger of sinking. Captain Wolfe apparently did not notice any specific damage to either of these two structures, but he readily admits that his primary attention that night was to retrieving his barges and to the damage to those barges,

10. Captain Wolfe referred to this structure as "the upper most dolphin." As there appears to have been no dolphin structure at the

ICG/Peabody facility, the Court believes that the captain innocently misspoke by referring to this structure as a dolphin instead of as a cell.

and not to any damage to these or other fixed structures.

Paul Roos,[11] a pilot working in the St. Louis Harbor for Eagle Fleet that night, also witnessed the drifting barges. Around 7:45 p.m., he received a radio call from his dispatcher concerning a breakup in the river. At that time, he proceeded upriver to give what help he could. When he reached the Poplar Bridge (UMR Mile 179.2), which is just south of the ICG/Peabody facility, no barges had floated by, but he could see "a large group" of barges, more than nine, adrift just off the ICG/Peabody facility. He saw one block of these barges strike along the line of mooring cells at the facility; from what he saw, some of the barges in this block separated when the block struck the line of cells and others of these barges "hung up" for awhile before drifting off again.

Meanwhile, Roos turned downriver in an effort to retrieve another block of these errant barges. Just below the McArthur Bridge (UMR Mile 179.0), which is immediately downriver of the Poplar Street Bridge, he engaged three of these barges (viz., the spike barge and the two barges abreast just aft of it), while at least another four drifted by. His crew discovered that the couplings were "not completely made" for these barges and thus attempted to tighten the couplings, but the spike barge separated from the other two barges before the crew was able to complete the tightening.

Roos testified that during this time period in the St. Louis Harbor area, the only breakup of which he was aware was the breakup from the STOUT. According to joint trial stipulations, no other barge breakaway or marine casualty in the St. Louis Harbor area on October 28 or 29, 1986 was reported to or investigated by the Coast Guard; further, representatives of the only barge fleeting facilities and barge loading/unloading terminals in the area would state that no vessels or other marine equipment from their facilities and terminals were adrift or in the vicinity of plaintiffs' two structures for the period at issue and that defendants' barges were the only vessels adrift in the St. Louis Harbor and the only vessels in the vicinity of either the ICG/Peabody facility or the Pillsbury Sauget facility for the period at issue.

The day following the breakup, Vince O'Brien, who was then operations manager for Pillsbury's three facilities in the St. Louis area, formally notified defendants by telex of the damage to the two facilities and made demand therein for all such damage. That morning, both plaintiffs and defendants sent out independent marine surveyors, Mason Eugene Thompson for plaintiffs and John Stickling for defendants, to inspect both the cell at the ICG/Peabody facility and the dolphin at the Sauget facility. Because of the fast current from the high water, no diver was sent out. Pillsbury scheduled a diver inspection for early December 1986, but it had to be resched-

---

**11.** At the close of plaintiffs' case, well after Roos had testified, defense counsel moved to strike Roos' testimony in its entirety on the alleged grounds that plaintiffs had not listed Roos' name on certain interrogatories.

At or before the initial pretrial conference held on November 10, 1988, Roos' name was handwritten in the typed pre-trial order; handwritten next to his name appear the initials of both plaintiffs' and defendants' counsel as well as their notation "facts surrounding incident." See R.Doc. 70, ¶ 13(a)(36), at 22. At that same conference, the Court extended discovery, which extension implicitly included any depositions of Roos. Further, defense counsel never objected to Roos' testimony either before, during, or immediately after his testimony. Thus, in the exercise of its broad discretion (and even presuming that this handwritten addition to the proposed pretrial order did not constitute a suf-

ficient amended response to defendants' earlier interrogatories), the Court denied the motion. See Hardy v. Chemetron Corp., 870 F.2d 1007, 1008–09 & n. 2 (5th Cir.1989); cf. Calamia v. Spivey, 632 F.2d 1235, 1237 (5th Cir.Unit A 1980) (upholding admission of evidence at a non-jury trial) ("The trial judge has broad discretion in determining whether to admit evidence and witnesses not included in pretrial order."); Murphy v. Magnolia Electric Power Ass'n, 639 F.2d 232, 235 (5th Cir.1981) (reversing trial court's refusal to let witness testify, where opponent showed no prejudice and the witness' testimony concerned a material element of the appellant's case). See generally Acts 8:32–33 ("And like a lamb silent before its shearer, so he opened not his mouth. In his humiliation, his justice was taken away." (citing Isaiah 53:7–8)).

uled because the river was still too high for such work. Not until the end of December 1986, when the river had gone down, were the two surveyors able to conduct a more thorough survey with a diving crew.

A week following the breakup, Orgulf's director of claims, Paul K. Dykes, completed and filed a Coast Guard Form No. CG–2692 concerning the breakup. In the report, he estimated the cost of damage from the breakup to facilities along the Illinois bank at $410,000; at his deposition,[12] he testified that this figure included, among other amounts, an estimate for damages to the ICG/Peabody facility and the Pillsbury Sauget facility.

Steve Sternau was Pillsbury's superintendent of operations under O'Brien at both the ICG/Peabody and the Sauget facilities in October 1986. Because of the rising river conditions, Sternau had inspected, among other structures, both the cell at the ICG/Peabody facility and the dolphin at the Sauget facility during the daytime on October 28th; he had found both to be standing erect. Both facilities were only operating dayshifts during that general period and had been closed during the evening and night of October 28th and the early morning of October 29th. He discovered no other structure at either of these two facilities to have been damaged during this period and knows of no other time when either of these two structures sustained damage. No contradictory evidence on any of these points was offered.

To the knowledge of plaintiffs' witnesses, some of whom have worked around and see these two structures almost daily, nei-

ther structure has been used after the breakup, to tie off barges or for any other purpose. Sternau stated that prior to the December joint survey inspection neither structure was used because no one knew the full extent of damage and that after this inspection neither was used because Pillsbury, through the advice of its consultant marine surveyor and then its consultant civil engineer, did not believe either structure was structurally sound or safe in its damaged condition. According to O'Brien, he instructed that neither structure be used until it is repaired or replaced.

The use of these two structures saves production time and the need to use outside tugs and thus saves money in the operations at these two facilities. The loss of these structures has taken away some of the flexibility and convenience in the operations at these two facilities and has made these operations more dependent on outside fleeting services, which cost additional money. Plaintiffs readily admit, however, that both facilities have continued to operate and that the loss of these two structures has not affected the number of barges that either facility can handle.

Apparently, plaintiffs never insured either structure from loss or damage.

### D. *Repair/replacement efforts*

After Thompson submitted his two survey reports concluding that neither structure should be used in its present state, Ralph B. Geest, Pillsbury's regional superintendent under O'Brien for this area, interviewed three engineering firms in order to choose one for determining what further

12. Defense counsel initially objected to introduction of this deposition on grounds that it was solely being used to introduce, in violation of F.R.Ev. 408, evidence concerning settlement letters and negotiations between Pillsbury and defendants in October 1987. Overruling the objection, the Court admitted the deposition. Among other things, the sole portions of Dykes' deposition that plaintiffs seek to introduce (i.e., Depo. 12:10–14:6, 51:24–52:22, 60:25–61:24, 78:15–:25, 80:23–82:2) do not concern any such evidence. Pursuant to F.R.Civ.P. 32(a)(4) and F.R.Ev. 106, defense counsel then requested that the entire deposition (including presumably the unidentified portions to which his objections had been directed) be introduced, though with-

out any explanation of why all or any of his new portions "ought in fairness to be considered contemporaneously with" the limited portions plaintiffs introduced.

In any event, the Court finds it unnecessary to rely on any alleged admission against interest made by defendants' employees in these letters and meetings. Thus, defense counsel's objection to Dykes' deposition and Exhs. P–25 and P–26 is now moot. *Cf. Figgs v. Quick Fill Corp.,* 766 F.2d 901, 903 (5th Cir.1985) (any error in admitting alleged settlement-type statements in a nonjury trial was harmless, where other evidence was sufficient to support the court's findings); *In re Multiponics, Inc.,* 453 F.2d 853, 855 (5th Cir.1972).

steps should be taken on the two structures. Geest chose the Campbell Design Group, which provided the lowest bid for the work (viz., $4000) and whose project manager, Richard D. Lodewyck, who is also plaintiffs' civil and structural engineering expert, had previously helped install the present cell at the ICG/Peabody facility in 1980.

Campbell Design inspected the two structures with survey crews in April 1987. It agreed that neither should be used in its present condition. Suggesting various potential options (discussed in greater detail in Parts I(E) and I(F) below), Campbell Design made an initial recommendation to Pillsbury as to each structure: in short, to replace the cell and to repair the dolphin.

When Pillsbury received these recommendations, it reviewed them with Campbell Design and then had Campbell Design prepare a "bid package" for the two structures. Pillsbury provided the boilerplate portion of the bid package, while Campbell Design provided the bid specifications and reviewed the entire bid package. Campbell Design's specifications contained modifications from those for the present cell (there were no changes for the dolphin), but the modifications were minor and contained no "significant cost-bearing changes."

Included in the bid package is article 5.2.1, an industry-standard provision in almost every private bidding package that "[t]he owner shall have the right to reject any and all Bids," and article 5.3.1, another standard provision that "[i]t is the intent of the Owner to award the Contract to the lowest responsible Bidder." According to Lodewyck's uncontradicted testimony, article 5.2.1 does not affect bidding prices.

On September 21, 1987, Campbell Design sent out the bid package to five regional contractors, some of whose work was primarily in marine construction and others of whose was not. Three submitted sealed bids by the submission date of October 7, 1987; a fourth responded that it had a backlog of other work; and the fifth did not respond. Pillsbury also contacted defendants in order to determine if they wanted to seek any other bids; defendants replied that they were satisfied with the group of contractors to whom Pillsbury had sent the bids. Upon reviewing the bids, Campbell Design, together with Geest, recommended that Pillsbury accept the lowest bids, all by Massman Construction Company of Kansas City, Missouri, whose work is about half marine-related and half non-marine-related.[13] As is industry custom, Campbell Design then commenced preliminary discussions with Massman concerning the details of the work, it being Campbell Design and Massman's understanding at that time that work would begin soon thereafter, to take about two to three months to complete, before the winter ice or spring flood concerns. Defendants' engineering expert, Paul H. Weis, admitted on cross-examination that Pillsbury followed the generally accepted procedure for obtaining proper prices for such construction work.

Pillsbury has not yet accepted Massman's bids. According to O'Brien, whose duties included the budgets for these two facilities, it has been a matter of simple economics: he has not had the money in his budget to pay for the replacement costs and has been awaiting funds from defendants in connection with the instant litigation. In July 1988, Lodewyck spoke with Massman again to determine if their bids

---

**13.** Reported decisions in this circuit and elsewhere illustrate Massman's wide range of experience in building fixed structures in and over the Mississippi. *See Watson v. Massman Construction Co.,* 850 F.2d 219 (5th Cir.1988) (concerning Massman's construction of the new Crescent City Connection Bridge); *Smith v. Massman Construction Co.,* 607 F.2d 87 (5th Cir.1979) (per curiam) (concerning Massman's work with a caisson that was to become part of a bridge it was constructing); *cf. Matter of Flowers,* 526 F.2d 242 (8th Cir.1975) (concerning damage to barges owned by Massman); *Massman Construction Co. v. Sioux City & New Orleans Barge Lines, Inc.,* 462 F.Supp. 1362 (W.D. Mo.1979) (concerning damage to a barge leased by and a crane owned by Massman).

Further, another opinion shows that Massman had even built sheet pile cells before. *See Massman Construction Co. v. Tennessee Valley Authority,* 769 F.2d 1114, 1116 (6th Cir.1985), *cert. denied,* 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986).

were still open; Massman replied that it was still willing to do the work for the same price.[14]

According to both Geest and O'Brien, both structures were and are an integral part of the business at these two facilities. According to O'Brien, it had been Pillsbury's full intent, up to the sale with ConAgra, to restore and reuse the two structures upon termination of this litigation and has been ConAgra's intent, after the sale, to have Pillsbury restore the structures upon termination of this litigation and thereafter for ConAgra to begin using the two structures.

### E. *The cell at ICG/Peabody*

The cell is a large cylindrical structure that stands in the river current off the shore at the ICG/Peabody facility. The outside is composed of continuous interlocking steel sheet pilings that extend into the mudline; the inside contains granular fill for stability and strength; the top is covered with a reinforced concrete cap and is crowned by a navigation light. The cell is about 195 feet upstream from the next cell at the facility. The cell's purpose is to tie off extra barges waiting to enter the facility and, in the winter, also to act as an ice shearer for the facility. The cell is not permanently attached to any other structure. The record does not reveal whether the Corps of Engineers ever issued a permit for the cell.

Lodewyck testified that the cell "clearly" had an expected useful life of 40 years and that his conclusion is corroborated by evidence that other cells at the facility are around 35 years old and still in fine working order. Weis testified that this 40–year figure was "possible" where the cell is protected and that the greater its use, the smaller its expected useful life; nonetheless, he offered no estimate of his own at trial.[15]

Like virtually all other assets at the ICG/Peabody facility, the cell has been and is owned by ICG and Burlington Northern. Under the lease agreement for the facility, including the cell:

> Pillsbury agrees to maintain the Leased Property in good and operable condition, reasonable wear and tear excepted, and will repair, maintain and renew all facilities to a condition existing on the commencement of the agreement [November 1, 1983] at its own expense when in [ICG and Burlington Northern]'s judgment such action is required to keep same in good order, condition and repair for purposes intended of this Agreement.

Pursuant to this provision, ICG has made demand on Pillsbury to restore the cell to its former condition.

The present cell was installed in 1980, in which year a previous cell in the same location had been struck by a barge. The earlier cell was 16 feet in diameter; the present cell is 17½ feet in diameter and surrounds the remnants of the earlier cell. According to Lodewyck, four constraints limited the design of the present cell: (1) it was not economically feasible to remove all debris from the earlier cell below the mudline; (2) the next-smaller size than the original 16–foot cell was structurally inadequate for operating with the barges typically used at this facility; (3) it was not advisable to place a new cell further instream or outstream than the original cell because of unwanted effects of the river current; and (4) it was not practical to place a new cell further upstream or downstream because the earlier cell was already in the optimal location for the operational function for which it was being used (in other words, the distance between cells was already fixed for all practical purposes by the standard 195–foot barges predominantly used

---

**14.** As reflected in article 4.3.1, on withdrawal of bids, the bid package does not contain an explicit expiration date for acceptance of any bid. Massman's bid, however, contains the following proviso: "We reserve the right to amend or withdraw our proposal if not accepted within thirty (30) days." *See* Exh. P–50.

**15.** While defense counsel did not introduce the expert reports of Weis and Stickling at trial, he did provide them to the Court in connection with his supplemental proposed conclusions of law, *see* R.Doc. 98, Exhs. A–B. Both reports estimate the cell's expected useful life as being about 40 years.

in this location).[16]

Both Sternau and Thompson inspected the cell from the riverbank on the morning of October 29, 1986. The ten-foot section of the cell exposed above the waterline was leaning downstream about two feet, and a power pole and line had been knocked down.

At the December inspection, the cell was leaning to the same extent. The lower water revealed that the sheet pilings of the cell had been separated in several locations and that there was a deep indentation in the cell the perfect size of a barge head.

Stickling testified that on two occasions near the beginning of this year, he saw barges moored outside the cell. Once was from a downtown St. Louis office building across the river; the second time was two to three weeks later from a car on a nearby highway. He admitted that on neither occasion could he see whether any barge was attached to the cell, but added that there are no other structures to which a barge could have been attached. Weis similarly testified that he had seen two barges "against" the cell this past March but did not know whose barges these were.

Campbell Design proposed five options for the cell: (1) to leave the cell as is, (2) to replace the cell, (3) to remove but not to replace the cell, (4) to repair the cell, or (5) not to remove the cell but to install a new cell nearby. Campbell Design recommended the second option (viz., to cut off the existing cell at or just below the mud-line and to replace it with a new cell at the same location) as the most economic way to have a structure returned to Pillsbury's previous use. Campbell Design estimated this second option to cost about $180,000. For much the same reasons that the original cell was replaced with a slightly larger cell, Campbell Design recommended that the proposed new cell be 20 feet in diameter, which is the next-larger size than a 17½–foot cell. Despite its slightly larger size, however, a 20–foot cell would not increase the work capacity at the facility. No evidence was presented whether a 20–

---

16. Barges of dimensions 195 feet by 35 feet have long been prevalent, or at least not at all uncommon. A cursory review of Fifth Circuit cases alone reveals many instances of barges of this size. *See Ideal Basic Industries v. Clydesdale Corp.,* 823 F.2d 885, 886 (5th Cir.1987) (per curiam opinion adopting opinion below) (cement barges); *Mac Towing, Inc. v. American Commercial Lines,* 670 F.2d 543, 545 (5th Cir. 1982) (carrying aluminite); *Cook Industries, Inc. v. Barge UM–308,* 622 F.2d 851, 852 n. 1 (5th Cir.1980) (dry cargo barge carrying soybeans); *Lacaze v. Olendorff,* 526 F.2d 1213, 1214 n. 1 (5th Cir.1976) (open hopper barge); *Johnson v. Warrior & Gulf Navigation Co.,* 516 F.2d 73, 75 (5th Cir.1975) (unmanned open dumb barge carrying railroad rails); *Moye v. Sioux City & New Orleans Barge Lines, Inc.,* 402 F.2d 238, 239 (5th Cir.1968) (covered hopper barge), *cert. denied,* 395 U.S. 913, 89 S.Ct. 1759, 23 L.Ed.2d 226 (1969); *Mississippi Valley Barge Line Co. v. Indian Towing Co.,* 232 F.2d 750, 753 (5th Cir.1956) (integrated steel barge).

Defense counsel attempted to ask Stickling whether barges of other lengths were usable at this location and whether the 195–foot spacing was necessary. Plaintiffs' counsel objected to these questions on the ground that such testimony would go beyond the parameters of Stickling's report. Upon reviewing Stickling's report and noting that it solely addressed the issue of the two structures' expected useful lives and gave no "fair warning of the expert's expected testimony" in the area to which the questions were directed, the Court sustained the objection. *See Book v. Nordrill,* 826 F.2d 1457, 1460–61 (5th Cir.1987) (upholding exclusion of expert testimony going beyond parameters of timely report, where appellee had warning of such testimony only one business-day before trial); *cf. Hardy,* 870 F.2d at 1008 (upholding admission of expert's testimony where "fair warning" had been given). Further, defense counsel had failed to lay a foundation showing that Stickling's expertise extended to the area at issue. Defense counsel suggests that no prejudice could be shown because plaintiffs listed Stickling in the pretrial order as a witness they might call, *see* R.Doc. 70, ¶ 13(a)(23), at 21, and attempted to introduce portions of his deposition at trial, *see* R.Doc. 100, at 7 (because defendants had brought Stickling to trial, the Court did not admit the deposition). Defense counsel misperceives the basis of the objection. Plaintiffs' counsel did not object to Stickling's testifying in *any* regard, but simply objected to his testifying about new matters not raised in his survey reports or in his expert report on depreciation (i.e., new matters on which plaintiffs' counsel would be unprepared to cross-examine Stickling effectively for lack of prior appraisal of the bases for these matters). As plaintiffs' summary of the deposition testimony they sought to introduce (as well as an independent review of the entire deposition) suggests, there is no basis for an inference that plaintiffs had any idea that Stickling might be asked about anything other than what was in these reports.

foot cell generally has an expected useful life the same as or different from a 17½–foot cell.

Another of the cells at the facility had been repaired with the addition of a "half-cell." This option, Lodewyck explained, however, was not available for the present cell because, unlike the other cell, which merely had a hole in it, the present cell was leaning too far for a half-cell repair to be effective.

Massman submitted the low bid of $176,500 to remove the present cell and replace it with another cell at the same location. Lodewyck testified that, based on his experience in preparing and evaluating costs—including marine construction costs—as part of his work, this bid was reasonable for two principal reasons. First, it was consistent with the previous history of costs; according to him, Massman's bid to replace the cell was "only slightly over" the cost in 1980 to replace the earlier cell with the present cell. Second, by having qualified contractors respond to a detailed bid package, Pillsbury and Campbell Design followed the industry standard for best determining market costs on such items.

Defendants' engineering expert, Paul Weis, did not contest the conclusion of both Lodewyck and Thompson that the present cell is now structurally inadequate for its full intended purpose. In this regard, Weis testified that it would be speculation whether the cell could support more than one barge at this time.

Weis disagreed, however, on the reasonableness of Massman's figure to implement Campbell Design's recommendation as well as on the reasonableness of Campbell Design's recommendation.[17] First, he believed that the cell could be replaced in the same location for $146,000 using land-based construction equipment alone. Second, he believed that it would cost $121,000 to leave the existing cell in place and to install a new cell just south of it, thereby providing extra protection to the new cell and thus actually improving the facility. On cross-examination, Weis admitted that he had never seen a cell installed with land-based equipment and that he had received no commitment from any contractor to do the work for the prices he gave.

Plaintiffs' expert, Rick Lodewyck, criticized Weis' opinion in several respects.[18]

**17.** Defense counsel sought to ask Stickling about estimates to replace or repair. Again, the Court sustained an objection by plaintiffs' counsel. As mention above in footnote 16, such testimony went beyond the parameters of Stickling's reports. Further, defendants were not precluded from presenting evidence on this point, as Weis' testimony attests. *Cf. Wilson v. Johns–Manville Sales Corp.,* 810 F.2d 1358, 1363 (5th Cir.) (upholding exclusion of expert's testimony, where expert had refused to produce certain documents and "no showing [was] made that [expert] was the only expert who could testify in support of appellants"), *reh'g denied mem.,* 815 F.2d 700 (5th Cir.), *cert. denied sub nom. Wilson v. Armstrong World Industries,* —— U.S. ——, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987).

**18.** Defense counsel objected to Lodewyck's being permitted to testify in this area inasmuch as such testimony went beyond the parameters of his original report. In his post-trial memorandum, defense counsel suggests that the Court abused its discretion by treating Lodewyck and Stickling differently. Again, defense counsel misperceives the basis of the Court's rulings.

First, unlike defense counsel, plaintiffs' counsel provided defense counsel with a summary of Lodewyck's new testimony a full week before trial. *See* R.Doc. 112 (showing supplemental report received April 20, 1989). *Compare Book,* 826 F.2d at 1460–61 (upholding refusal to admit expert testimony based on supplemental report submitted one business-day before trial) *with Davis v. Duplantis,* 448 F.2d 918, 921 (5th Cir. 1971) (upholding admission of doctor's testimony, where initial report was exchanged only eight days before trial).

Second, defense counsel failed to give timely notice that he intended to call an engineering expert, thereby leading plaintiffs' counsel to the reasonable (but eventually erroneous) conclusion that defense counsel would offer no engineering expert and thus no contradictory expert testimony to Lodewyck's testimony. Specifically, defense counsel included no engineering expert in the pretrial order and did not seek to amend the pretrial order to add Weis' name until just days before plaintiffs' expert reports were due. (Defendants filed their *ex parte* motion to amend on Thursday, February 23, 1989; the Clerk entered the Court's order granting the motion on Monday, February 27, 1989, on which same date, plaintiffs filed an opposition to the motion; and plaintiffs' expert reports were due by Wednesday, March 1, 1989.)

Third, there is no indication in the pretrial order or elsewhere to suggest that defendants

First, Lodewyck believed the use of land-based equipment to be too risky. Land-based equipment could only be considered at times when the river was extremely low such as during last summer's draught, when Weis did his inspection; however, there are uncertainties and dangers, of which prudent contractors are fully aware, that the river might rise suddenly and significantly while work is in progress.[19]

Second, Lodewyck believed that use of land-based equipment would require a sufficiently large-sized crane and the construction of a large crane pad of approximately 100 cubic yards of dirt, which would also require a permit from and testing by the Corps of Engineers.[20] On cross-examination, he admitted that the use of timber mats might be possible in lieu of an entire pad. He nonetheless stressed that a large crane with a boom of at least 60 feet would still be required, for even a smaller crane would be unable to stand right next to a low waterline inasmuch as the riverbank is relatively steep and sandy for cranes. In Lodewyck's opinion, Weis underestimated these costs.

Third, Lodewyck believed that Weis' estimate for demolition of the present cell (viz., $5000) was unreasonably low. The actual demolition cost in 1980 for the earlier cell was $30,000, and such costs in the St. Louis area have, Lodewyck testified, generally risen about 4–5% annually; Massman's present estimate is $36,000, and the other two contractors submitted bids at $61,000

and $68,000. He similarly testified that it is unlikely that the cell could physically be removed at or below the mudline without the use of divers or any marine equipment. Weis responded that a viable alternative would be to cut off the present cell well above the mudline and simply to encircle a new cell around the old one.

Fourth, Lodewyck testified that if land-based equipment were used, a contractor would still have to use pontoons or other marine equipment to hold the large steel template necessary for guiding the placement of any new cell. This cost as well Weis omits.

Finally, Lodewyck noted that Pillsbury's bid package contained no restrictions against the use of land-based equipment. On cross-examination, he stated that a project manager from Massman had advised him that no prudent contractor would work from shore.

In Lodewyck's opinion, the cheapest amount for which a contractor using land-based equipment could replace the cell is about $195,000. This conclusion, he added, corroborates his belief that no contractor would choose to replace the cell using land-based equipment.

### F. The dolphin at Sauget

The dolphin is a structure consisting of three steel pipes driven into the river bottom in the shape of a triangle. Each pipe is 30 inches in diameter, is filled with sand,

would assert that the cell should be replaced with land-based equipment. Weis' own testimony that he had never seen a cell replaced from land certainly supports the Court's belief that plaintiffs were "surprised" by the contents of Weis' report, that land-based equipment should be used.

Finally, defendants show no prejudice from the admission of this testimony, which was essentially rebuttal testimony the Court permitted to be given out of turn in anticipation of Weis' testimony; in other words, defense counsel was not precluded from effectively cross-examining Lodewyck, for he could and did call Weis to testify on these exact issues. *See Hardy*, 870 F.2d at 1008–09 & n. 2 (citing *Murphy*, 639 F.2d at 234–35); *cf. Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1138–39 (5th Cir.1985) (affirming judgment for plaintiff where he raised issue in anticipation of defendants' defense); *In re Air Crash Disaster Near New Or-*

leans, *Louisiana on July 9, 1982* (*Turgeau v. Pan American World Airways, Inc.*), 764 F.2d 1084, 1090 (5th Cir.) (upholding rebuttal testimony), *reh'g denied mem.*, 770 F.2d 164 (5th Cir.1985). *Contrast Bradley v. United States*, 866 F.2d 120, 125 (5th Cir.1989) (per curiam).

**19.** *See also Elaine Jones*, 480 F.2d at 15–16 (describing a rise in the Mississippi River at the St. Louis Harbor from 4.7 feet to 30.3 feet in just 5 days).

**20.** *See* 33 U.S.C. §§ 403–404; *Tatum v. Blackstock*, 319 F.2d 397, 399 (5th Cir.1963); *see also United States v. Lewis*, 355 F.Supp. 1132, 1136–37 (S.D.Ga.1973) (the Corps' authority over a navigable river extends up to the river's mean high-water line); 33 C.F.R. § 329.11(a), *interpreted in Vieux Carre Property Owners, Residents & Associates, Inc. v. Brown*, 875 F.2d 453, 461–62 (5th Cir.1989).

and is connected to the other two pipes by horizontal and diagonal steel bracings at three levels. Photographs show a navigation light extending above one of the pipes. The dolphin's principal purpose is to hold captive a 195–foot maintenance crane barge, which (when not used elsewhere for intermittent repair work) is used at this position to assist in holding cargo barges waiting to be unloaded at the adjacent unloading dock/work barge. Like the cell, the dolphin is occasionally also used to tie off barges, is completely surrounded by water, and is not permanently attached to any other structure. Similarly, the record does not reveal whether the Corps of Engineers ever issued a permit for the dolphin.

The experts disagree on the expected useful life of the dolphin. Lodewyck estimated it to be 40 years, while Weis estimated it to be 20 years.[21] Lodewyck admitted that his estimate for the dolphin was "more of a judgment call" than was his estimate for the cell, but added that he knew of no reason why the dolphin should last shorter than a cell, provided that the welds on the dolphin were properly inspected and maintained over time. His estimate takes into account variables such as location, service, exposure, and environment, but not any variable for likelihood of accidents; the estimate also relies on industry data concerning dolphins' corrosive and fatigue properties, especially at welding points. Weis did not explain the basis of his figure or suggest any error in the basis of Lodewyck's figure.

According to Superintendent Sternau, Massman Construction Company built the present dolphin in 1984 or 1985 for Pillsbury, who paid for the construction. According to Surveyor Stickling, an earlier dolphin in the same location had been both struck by a barge and replaced in 1984; according to Lodewyck, however, that was a dolphin in a different location.

The lease for this facility provides that "Pillsbury shall own any and all improvements of any nature installed by it ... and (i) may remove same at any time ... or (ii) may abandon any and all such improvements." Vince O'Brien testified that Pillsbury had installed all the dolphins as improvements to the facility.

On the October 29th joint inspection from the riverbank, both Thompson and Stickling observed the dolphin leaning downstream with bracing that was distorted, buckled, and/or broken. According to Thompson, the exposed 20–25 feet of the dolphin above the waterline was leaning downstream about 2–3 feet.

Based on his observation of the acute leaning and disfigured bracing, Thompson was of the initial opinion that the dolphin had to be replaced. At the December joint inspection, the dolphin was also leaning to the same extent. Thompson found, however, that the bracing was damaged to a greater extent than he had originally suspected. Stickling did not contradict, or even comment on, this testimony.

At present, according to uncontradicted testimony, it is impossible to use the dolphin for its intended purpose.[22] First, the damage has deprived the dolphin of its structural integrity. Second, because the dolphin is leaning too far downstream, a standard 195–foot barge can no longer fit between the dolphin and its adjacent cell.

Campbell Design proposed two options for the dolphin: (1) to remove and replace it in whole, or (2) to attempt to straighten

**21.** *See also Shell Oil Co. v. Boston Fuel Transportation, Inc.,* Civ. No. 82–2431–MA, slip op. (D.Mass. Nov. 15, 1983) [available on LEXIS] (finding that breasting dolphin had a 20–year useful life); *Phillips Petroleum Co. v. Trinidad Corp.,* 1979 A.M.C. 1352, 1354 (M.D.Fla.1978) (same for two breasting dolphins); *Rawls Brothers Contractors, Inc. v. United States,* 251 F.Supp. 47, 53 (M.D.Fla.1966) (same for dolphin that did not have an electronic anti-corrosion device attached); *cf. Patterson Terminals, Inc. v. S.S. Johannes Frans,* 209 F.Supp. 705, 710 (E.D. Pa.1962) (finding that dolphin had a 25–year life expectancy). Unlike the dolphin at the Pillsbury Sauget facility, however, the dolphins in at least *Shell, Phillips,* and *Patterson* were specifically designed to take impact from ships.

**22.** Plaintiffs' counsel objected to Stickling's testifying on this point. For the reasons indicated above in footnotes 16–17, and because, as Stickling admitted in his voir dire, he is not an engineering expert, the Court sustained the objection.

it. Campbell Design estimated the first option to cost about $105,000 and the second about $45,000. Campbell Design initially recommended the second option notwithstanding a slight diminution in structural strength under this option. Massman submitted the low bid of $119,800 to replace it, the low bid of $90,500 to repair it,[23] and the low bid of $136,800 to attempt to repair it but to replace it if necessary.

Partially because extensive repairs to a dolphin had not been attempted before, none of the contractors, including Massman, would guarantee that any repairs would be successful. Upon receiving these bids and noting that it had underestimated the costs to repair the dolphin, and especially in light of the contractors' reluctance to guarantee and thus their skepticism in any repair work, Campbell Design changed its recommendation for the dolphin. Because of the risks and uncertainty in attempting to repair the dolphin, Campbell Design thought it more prudent to spend the relatively little extra money for replacing the dolphin. Concurring in this cost/risk analysis, O'Brien accepted this recommendation on behalf of Pillsbury.

For the same reasons that he found Massman's bid to replace the cell reasonable, Lodewyck testified that Massman's bid to replace the dolphin was reasonable as well. Weis concurred that replacement of the dolphin was necessary and that $119,800 was a reasonable estimate for replacing the dolphin. Unlike his recommendation for the cell, Weis made no mention of placing a new dolphin adjacent to the present one.

There is absolutely no evidence that the dolphin has been used for any purpose subsequent to the breakup. According to Geest, no temporary repairs were ever made to the dolphin because such would not have made the dolphin structurally safe to use.

### G. *Incidental expenses*

At Geest's recommendation and approval, Pillsbury has spent the following amounts in connection with the damage to these two structures. It paid $567 to Cairo Marine Service, Inc. for the two surveys by Thompson. It paid $516 to Able Marine Divers for its diving services performed in connection with the December joint survey for both structures. It paid $661.25 to American Commercial Marine Service Company for a boat charge when Campbell Design surveyed the cell in April 1987. It paid $143.75 to Louisiana Dock Company for a boat charge in an early December survey of the cell (this survey was aborted because the water level was still too high). These four amounts were paid and necessary to help ascertain the extent of damage in order to determine whether repairs and/or replacement was necessary.

Pillsbury paid $4000 to Campbell Design Group for its initial services in submitting recommendations for both structures. For the remaining services to date, Pillsbury has paid $12,870 (65% of $19,800) to Campbell Design. According to both Geest of Pillsbury and Lodewyck of Campbell Design, Pillsbury is already contractually obligated to pay Campbell Design another $6930 (35% of $19,800) for Campbell Design's inspecting and supervising the installation work when the two structures are actually replaced.

### II.

### A. *Jurisdiction and venue*

Because plaintiffs' complaint states a colorable claim for relief within the Court's admiralty and maritime jurisdiction and the meaning of F.R.Civ.P. 9(h), the Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1).[24]

■ Because the Court has personal jurisdiction over Midland and Orgulf inasmuch

---

**23.** Massman originally submitted a bid of $95,000 to repair the dolphin. After Massman submitted its bids and consistent with general practice, Lodewyck discussed with Massman certain minor charges in Massman's bid for the cell and was able to negotiate a $4500 reduction; thus, Massman's final bid to repair the dolphin was for $90,500.

**24.** *See McCormick v. United States,* 680 F.2d 345, 347–48 (5th Cir.1982) (allision between vessel and piling in navigable waters came within admiralty jurisdiction). *See generally* Admiralty Jurisdiction Act, 46 U.S.C.App. § 740 (claim for damage "caused by a vessel on navigable water" comes within admiralty jurisdiction, regardless of situs of damage) (overruling *Southern Light-*

as each does business in this district, venue is proper in this district.[25]

█ In two documents in the record, defense counsel (mistakenly?) purported to make an appearance on behalf of the STOUT; counsel did not, however, expressly state, "on oath or solemn affirmation" or otherwise, "that he [was] duly authorized to make" any claim of ownership.[26] Especially because plaintiffs do not still assert that an *in rem* judgment should be entered against the STOUT,[27] the Court holds that these two references are insufficient to constitute a waiver of the general requirement that a vessel be arrested before a court may assert *in rem* jurisdiction over it. Because the STOUT has not been seized in this action and neither a notice of claimant for the STOUT nor a letter of undertaking has been filed, the Court lacks *in rem* jurisdiction over the STOUT.[28] Thus, the Court dismisses without prejudice plaintiffs' claims against the STOUT.

## B. *Standing*

At the opening of the trial, defendants moved to dismiss the entire action under F.R.Civ.P. 17 for lack of standing on grounds that with the sale to ConAgra, Pillsbury no longer holds any interest in any of the structures and under F.R.Civ.P. 19 for failure to join indispensable parties on grounds that the owners of the structures are not plaintiffs in this action. The Court rejected this tendentious argument and now adds four remarks.

First, any distinction between the interests of Pillsbury and ConAgra is immaterial, for both are now plaintiffs before the Court. In response to defendants' motion, which defendants did not bring until the morning of trial, plaintiffs' counsel (while maintaining that, with the ratification agreement, joinder of ConAgra was unnecessary)[29] proposed a simple solution to defendants' argument that ConAgra was an indispensable party: join ConAgra as a party as well. Obtaining authority from ConAgra for him to represent it as well, plaintiffs' counsel then moved to join ConAgra. Because this solution would moot this portion of defendants' objection, did not require the admission of any further evi-

---

erage & Wrecking Co. v. United States, 284 F. 978 (E.D.La.1921) (damage to mooring pilings in Mississippi River by vessel does not come within admiralty jurisdiction), *aff'd by an equally divided Court,* 260 U.S. 699, 43 S.Ct. 91, 67 L.Ed. 470 (1922)).

**25.** *Bartlett-Collins Co. v. Surinam Navigation Co.,* 381 F.2d 546, 548 (10th Cir.1967); *see In re McDonnell-Douglas Corp.,* 647 F.2d 515, 516 (5th Cir. Unit A 1981). *See generally* F.R.Civ.P. 82 (providing that the provisions in 28 U.S.C. §§ 1391–1393 do not apply to admiralty claims under F.R.Civ.P. 9(h)).

While Midland and Orgulf pleaded that venue was "inconvenient," no motion to transfer or dismiss was ever filed and the issue was not raised in the pretrial order. *Cf. In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982,* 821 F.2d 1147, 1165 (5th Cir.1987) (en banc) (untimeliness in asserting such a motion "should weigh heavily against the granting of the motion"), *vacated in part on other grounds sub nom. Pan American World Airways, Inc. v. Lopez,* — U.S. —, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989) (per curiam).

**26.** *See generally* F.R.Civ.P.Supp.R. C(6). *But cf.* F.R.Civ.P. 11.

**27.** *See Flannery v. Carroll,* 676 F.2d 126, 129 (5th Cir.1982) (claim raised in complaint but omitted from pretrial order was considered waived); *cf. Carbalan v. Vaughn,* 760 F.2d 662, 665 (5th Cir.) (general prayer for "further relief" in complaint did not constitute a demand for injunctive relief where "proposed pretrial order ... sought only damages"), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 529, 88 L.Ed.2d 461 (1985). *See generally* F.R.Civ.P. 16(c).

**28.** *Associated Metals & Minerals Corp. v. S/S Portoria,* 484 F.2d 460, 461–62 (5th Cir.1973). *Contrast Panaconti Shipping Co. v. M/V Ypapanti,* 865 F.2d 705, 707–08 (5th Cir.1989) (construing stipulation as letter of undertaking); *Cactus Pipe & Supply Co. v. M/V Montmartre,* 756 F.2d 1103, 1107–10 (5th Cir.1985) (claim filed by vessel owner established *in rem* jurisdiction over vessel).

**29.** *See Southern National Bank of Houston v. Tri Financial Corp.,* 317 F.Supp. 1173, 1186–88 (S.D. Tex.1970), *modified and remanded on other grounds sub nom. Southern National Bank of Houston v. Crateo, Inc.,* 458 F.2d 688 (5th Cir. 1972). *See generally* F.R.Civ.P. 17(a) (ratification, joinder, and substitution are each permissible ways to cure objections that an action is not being brought by "the real party in interest"); *id.* 25(c) ("In case of any transfer of interest, the action may be continued by ... the original party").

dence, did not prejudice defendants in any way, was brought within "a reasonable time ... after objection," and generally "eliminate[d] any fear that the judgment debtor may be forced to pay the judgment more than once,"[30] the Court granted the motion.

Second, the sole evidence before the Court establishes that the owners of the cell are and have been ICG and Burlington Northern, both of whom are already plaintiffs before the Court[31] and have otherwise agreed to be bound by Pillsbury's prosecution of the claim for the cell.[32] As between plaintiffs and defendants, it is immaterial that these two owners may have contractual rights of repair against Pillsbury and/or ConAgra under the lease, where as here these two are not seeking any damages additional to what they could have recovered had there been no lessees.[33]

■ Third, all past and present owners of the dolphin (viz., Pillsbury and ConAgra) are similarly plaintiffs before the Court.

Citing four Illinois state cases,[34] defendants argue that under Illinois law, any structure affixed to land automatically becomes the property of the land owner. Defendants misconstrue the law; the general rule enunciated in those cases—"where a stranger enters upon the land of another without consent of the owner and makes an improvement of a permanent character ..., the improvement becomes the property of the owner of the land"[35]—does not, by its own parameters, apply where the improvement is made *with* the consent of the owner or by persons who are *not* strangers. To determine under Illinois law whether a structure installed by someone other than the land owner has become a part of the real estate upon which it stands (and thus is owned by the land owner) or instead has remained personal property (and thus is still owned by the person who installed it), courts are directed to look to the intent between the land owner and the person installing the structure.[36] The sole evi-

**30.** *Urrutia Aviation Enterprises, Inc. v. B.B. Burson & Associates, Inc.*, 406 F.2d 769, 770 (5th Cir.1969) (per curiam).

**31.** Defense counsel suggests that these two should not be treated as plaintiffs because they did not file the original complaint, but instead intervened. Where as here these two assert no rights conflicting with or different from Pillsbury or ConAgra, the method in which the two railroads entered the action is immaterial. The label "intervenors" is merely a convenient rubric that plaintiffs' counsel has chosen for succinct identification of the two railroads.

**32.** *See Rawls Bros.*, 251 F.Supp. at 48–49 (lessee permitted to pursue claim for damaged dolphin).

**33.** *See Vicksburg Towing Co. v. Mississippi Marine Transport Co.*, 609 F.2d 176, 177–78 (5th Cir.1980) (owner of barge unloading facility struck by defendant's vessel could recover for lost rents, where lease of facility required lessee to bear risk for any repair but abated rent due from lessee during any repair down-time), *cited with approval in State of Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1024 (5th Cir. 1985) (en banc), *cert. denied sub nom. White v. M/V Testbank*, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

**34.** *See Fitzpatrick v. Allied Contracting Co.*, 24 Ill.2d 448, 182 N.E.2d 183, 187 (1962) (improvements made by plaintiffs while they were in rightful ownership of the property passed to

defendants when defendants exercised their rights under a prior repurchase agreement that was silent as to any improvements); *Olin v. Reinecke*, 336 Ill. 530, 168 N.E. 676, 678 (1929) (defendant had made improvements while in wrongful but good faith possession of plaintiffs' property); *Worley v. Ehret*, 36 Ill.App.3d 48, 343 N.E.2d 237, 244 (1976) (defendants had made improvements while in wrongful, bad faith possession of plaintiffs' property); *Hayes v. Davis*, 307 Ill.App. 440, 30 N.E.2d 521, 522 (1940) (defendant had made improvements while in wrongful but good faith possession of plaintiffs' property).

In each of these cases except *Worley*, the court imposed an equitable lien in favor of the person who made the improvement and equal to the lesser of the cost of the improvement and the extent to which the improvement enhanced the property's value; in *Worley*, the defendants received no lien or other relief because they had acted in (legal) bad faith.

**35.** *E.g.*, *Worley*, 36 Ill.App.3d at 58, 343 N.E.2d at 244 (citing *Fitzpatrick*, *Olin*, and *Hayes*).

**36.** *See Hopwood v. Green*, 375 Ill. 167, 30 N.E.2d 656, 657 (1940) (upholding chattel mortgage on scale house and other property installed by tenant) ("The question whether fixtures become a part of the real estate is one of intention between the owner of the land and the party placing the structure upon the land."), *followed in Landfield Finance Co. v. Feinerman*, 3 Ill.App. 3d 487, 490, 279 N.E.2d 30, 33 (1972); *see also*

dence in the record of such intent is the language in the lease for the Pillsbury Sauget facility that any improvements shall be owned by the tenant (formerly Pillsbury and now ConAgra); this language evinces the express intent of the land owner and tenant/improvement maker that any improvements remain personal property of the tenant and not become fixtures to be owned by the land owner.[37] Because the evidence was uncontradicted that Pillsbury installed the dolphin as an improvement to the facility, the Court finds that the owner of the Pillsbury Sauget facility does not own the dolphin and thus is not an indispensable party.[38]

■ Finally, because the four plaintiffs assert their claims jointly and because the Court's award does not depend on any distinction among any of the four, the Court need not decide the rights of these four among themselves, but need only decide their joint rights as against the defendants.[39]

### C. *Allision*

■ It is more likely than not that one or more of the barges from the STOUT's tow struck and damaged plaintiffs' two structures. First, both structures were standing erect and undamaged just hours before the breakup and were found to be leaning

and damaged just hours after the breakup. Second, there is no evidence that any other barges or vessels, whether or not large enough to cause the damage discovered, were loose during that time period; indeed, Captain Wolfe and Pilot Roos testified that the barges from the STOUT were the only loose or runaway vessels in the area at that time. This circumstantial evidence alone is sufficient to support the finding that it was defendants' barges that caused the damage to plaintiffs' two structures.[40] Yet further evidence exists as to each structure.

Photographs taken by defendants' surveyor show the cell's large indentation that plaintiffs' surveyor described as being the perfect shape of a barge head. Captain Wolfe found one of the errant barges, which had been drifting down the fast running current and themselves at a noticeable speed, to be laying against the cell at issue. Pilot Roos saw a group of barges strike one of the cells, and evidence showed that the upriver-most cell (i.e., the cell at issue) was the only cell damaged. The slight variance between the two's testimony—unlike Wolfe, Roos did not recall any barges *remaining* against the cell—the Court finds to be but the innocent differences often found in common experience when two persons recollect the same event.[41]

*Rowlen v. Hermann*, 129 Ill.App.2d 45, 262 N.E.2d 739, 740–41 (1970) (abstract only) (where parties expressly agreed, structure remains personal property); *Westmore Supply Co. v. Frum*, 316 Ill.App. 306, 44 N.E.2d 949 (1942) (abstract only) (that a structure might be damaged in removal is immaterial to the structure's status, where the landlord and tenant had expressed the intent to treat the structure as the tenant's personal property).

**37.** *See United States v. 52.67 Acres of Land*, 150 F.Supp. 347, 350 (E.D.Ill.1957).

**38.** *See Borrowman v. Howland*, 119 Ill.App.3d 493, 75 Ill.Dec. 313, 316–17, 457 N.E.2d 103, 106–07 (1983).

**39.** *Cf. Allegheny Airlines, Inc. v. United States*, 504 F.2d 104, 112 (7th Cir.1974) (in property damage case, it was reversible error to dismiss lessor on grounds that it could recover from lessee, where both lessee and lessor were asserting their claims jointly), *cert. denied sub nom.*

*Forth Corp. v. Allegheny Airlines, Inc.*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 470 (1975).

**40.** *See James v. River Parishes Co.*, 686 F.2d 1129, 1131 (5th Cir.1982); *B & M Towing Co. v. Wittliff*, 258 F.2d 473, 474 (5th Cir.1958) (upholding finding of collision between a barge in tow and a stationary vessel, where libellant/eyewitness could not identify what vessel struck his vessel); *Koch–Ellis Marine Contractors, Inc. v. Sewerage & Water Board of New Orleans*, 218 F.2d 771, 772–73 (5th Cir.1955) (per curiam) (affirming finding, based solely on circumstantial evidence, that one of defendant's drifting barges struck pilings protecting plaintiff's wharf). *Contrast American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326–27 (5th Cir.1988) (upholding finding of no collision, where there was evidence that mooring fender at issue had been in disrepair and that the vessel at issue moored "in a normal and competent manner").

**41.** *Cf.* 3 E. Devitt, C. Blackmar & M. Wolff, *Federal Jury Practice and Instructions: Civil* § 73.01, at 50 (4th ed. 1987).

While no eyewitness saw a barge strike or touching the dolphin, one of defendants' barges, all of which appear to have been undamaged prior to the breakup, was found inside the Pillsbury Sauget facility and severely damaged in danger of sinking.

In their proper state, the cell and dolphin are each sturdy, rigid-standing, permanently-affixed, several-ton structures. They are not structures that suddenly and mysteriously break apart or fall down. The only rational explanation from the evidence presented to the Court is that one or more of defendants' meandering and similarly-several-ton barges floated down the river and crashed into these two structures.

In sum, the Court finds that one or more of the barges from the STOUT caused the damage to the cell and the dolphin at issue.

**D.** *Negligence and Causation*

1.

■ When an unmanned barge strikes a stationary object such as a dolphin or cell, the custodian of the barge has the burden to prove that his negligence was not a proximate cause of the allision.[42] Where the barge is in the custody of a towboat, the barge's custodian is held to include both the operator[43] (including the towboat captain's employer)[44] and the owner[45] of the towboat; in other words, this rule "operates against all parties who participated in the management of" the towboat.[46] This burden-shifting, which is more than simply a rebuttable presumption governed by F.R.Ev. 301,[47] applies whether or not the barge breaks loose from its custodian,[48] and whether or not the barge was owned by its custodian.[49]

While towboat owners often seek limitation of liability for lack of privity and knowledge of any navigational negligence by a towboat captain, defendants have raised no such defense. Nor would they have been entitled to such, for they did not file a complaint of limitation "not later than six months after receipt of a claim in writing" (viz., April 29, 1987, which was six months after O'Brien sent Dykes the telex). *See Exxon Shipping Co. v. Cailleteau,* 869 F.2d 843, 846 (5th Cir.1989); 46 U.S.C.App. § 185; F.R. Civ.P.Supp.R. F(1).

**42.** *Koch–Ellis,* 218 F.2d at 772 & n. 3; *see James,* 686 F.2d at 1131–33 (upholding liability against owner/operator of fleeting facility an errant barge from which struck moored barge downriver, where plaintiff presented no evidence of cause of breakaway); *cf. Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 794 (5th Cir.) (same rule for claim where manned ship struck mooring dolphin), *reh'g denied mem.,* 564 F.2d 97 (5th Cir.1977), *cert. denied sub nom. Furness Withy & Co. v. Bunge Corp.,* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978).

Defendants argue that the warranty of seaworthiness does not extend to plaintiffs' structures. Noting that defendants have cited no Fifth Circuit or Supreme Court case holding as much and because this Court is able to resolve this case solely on negligence grounds, the Court does not decide this issue.

**43.** *See Woods v. United States,* 681 F.2d 988, 990 (5th Cir.1982) (compulsory pilot was presumed negligent); *cf. CompanIa de Navigacion Porto Ronco v. S/S American Oriole,* 474 F.Supp. 22, 27 (E.D.La.1976) (holding liable wharfinger with sole custody of another's unmanned vessel that broke away and struck moored vessel and dock), *aff'd on basis of opinion below,* 585 F.2d 1326 (5th Cir.1978).

**44.** *See Delta Transload, Inc. v. M/V Navios Commander,* 818 F.2d 445, 451–52 (5th Cir.1987) (applying the doctrine of respondeat superior).

**45.** *See City of New Orleans v. American Commercial Lines, Inc.,* 662 F.2d 1121, 1123 (5th Cir.1981) (holding towboat owner liable where barge in tow damaged fender on dolphin; no mention of who operated towboat or who owned barge); *Koch–Ellis,* 218 F.2d at 772 & n. 3 (no mention of who operated towboat).

**46.** *See Delta Transload,* 818 F.2d at 449 & n. 8.

**47.** *Id.; James,* 686 F.2d at 1132–33. Dictum to the contrary in *S.C. Loveland, Inc. v. East West Towing, Inc.,* 608 F.2d 160, 165 n. 3 (5th Cir. 1979) (citing *Pennsylvania Railroad Co. v. S/S Marie Leonhardt,* 320 F.2d 262, 264 (3d Cir. 1963)), *reh'g denied mem.,* 611 F.2d 882 (5th Cir.), *cert. denied sub nom. St. Paul Mercury Insurance Co. v. East West Towing, Inc.,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980), had already been rejected in *Bunge Corp.,* 558 F.2d at 795 n. 3.

**48.** *Compare Brown & Root Marine Operators, Inc. v. Zapata Off–Shore Co.,* 377 F.2d 724, 726 (5th Cir.1967) (tug towing integrated barge) *and The Victor,* 153 F.2d 200, 203 (5th Cir.1946) (tug towing loosely rigged barges) *with James,* 686 F.2d 1129 (barges broke away from fleeting facility) *and Koch–Ellis,* 218 F.2d 771 (barges broke away from tree).

**49.** *See Compania de Navigacion,* 474 F.Supp. at 27 (wharfinger had sole custody, but not ownership, of unmanned vessel); *cf. City of New Orleans,* 662 F.2d 1121 (no mention of who owned the barges); *The Victor,* 153 F.2d 200 (same).

■] A person may meet this heavy [50] burden by proving by a preponderance of the evidence that the allision was an "unavoidable," or "inevitable," accident such as a *vis major* (greater force, or Act of God); [51] to establish this defense, the person against whom the burden-shifting is applied " 'must exhaust every reasonable possibility which the circumstances admit and show that in each [he] did all that reasonable care required.' " [52]

■ In this case, the Court finds not only that defendants have not established any inevitable-accident or other defense to meet this burden-shifting rule, but also that plaintiffs have overwhelmingly established by affirmative evidence that the negligence of both Captain Wolfe and defendants' management was a proximate cause of the breakup.

Both Captain Wolfe and Captain Poe believe, based on their experience as river captains, that the breakup was caused in part by loose rigging on the tow, including a lack of wing wires for the spike barge. The evidence was uncontradicted on this point. First, when the tow first entered the river, Captain Wolfe saw the spike barge "wiggle"; as Captain Wolfe implied, such an observation is a strong indication of insecure rigging and illustrates the merit in his dislike of spike barges in general and in spike barges without wing wires in particular. Second, Captain Wolfe candidly "doubted" that his crew could have tightened all the rigging within the time he gave it. Third, the experience of Pilot Roos' crew in attempting to rescue the spike barge corroborates Captain Wolfe's

conclusions. Fourth, the Court accepts Captain Poe's explanation of how the barges physically broke apart and why it is likely that a properly rigged tow would not have broken apart under the same conditions. In sum, the Court finds that loose rigging was a proximate cause of the breakup.

For two general reasons, the Court finds that Captain Wolfe was negligent in permitting the STOUT to proceed into the high river with this loose rigging. As his limited precautionary (but ultimately ineffective) measures demonstrated, Captain Wolfe was aware (even before he left the canal) of the high, fast river conditions and of the care demanded for those conditions. He should not have proceeded as he did. But he did.

First, Captain Wolfe was negligent in waiting as long as he did to have the rigging tightened. Sometime before 5:00 p.m., Captain Wolfe learned of the loose rigging, yet he did not take the initiative to direct anyone to tighten the tow until after his mate approached him sometime after 6:00 p.m. about the loose rigging. Had he directed his crew to begin tightening the rigging, at the latest, as soon as the barge-swapping with the OMEGA was completed, then it is likely that his crew could have tightened the entire rigging on the new tow without his ever having to consider stopping in the canal before proceeding into the river.

Second, Captain Wolfe was negligent in not stopping his vessel in the canal in order to let his crew complete its tightening oper-

**50.** *See Brown & Root,* 377 F.2d at 726 (finding that defendant did not meet the defense); *Petition of United States,* 425 F.2d 991, 995 (5th Cir.1970) (upholding defense, where barge owners had taken reasonable precautionary measures before the impending hurricane whose winds caused the barges to break loose).

**51.** *American Petrofina,* 837 F.2d at 1326 ("unavoidable"); *Nunley v. M/V Dauntless Colocotronis,* 863 F.2d 1190, 1197 (5th Cir.) ("inevitable"), *reh'g denied mem.,* 869 F.2d 1487 (5th Cir.1989).

**52.** *Boudoin v. J. Ray McDermott & Co.,* 281 F.2d 81, 88 (5th Cir.1960) (quoting *The Hylas,* 1925 A.M.C. 921, 925 (S.D.N.Y.1913) (L. Hand, J.));

*see The Louisiana,* 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85, 88 (1866) (defining "inevitable accident, or a *vis major*" as that "which human skill and precaution, and a proper display of nautical skill could not have prevented"); *see also Weyerhaeuser Co. v. The Atropos Island,* 777 F.2d 1344, 1347 (9th Cir.1985) ("The phrase 'human skill and precaution, and a proper display of nautical skill' is essentially synonymous with 'reasonable care under the circumstances' "). While *Boudoin* did not expressly discuss the moving-vessel/stationary-object rule, it is clear that *Boudoin's* standard applies to this rule. *Brown & Root,* 377 F.2d at 726; *see Petition of United States,* 425 F.2d at 995.

ation. To the extent that the lockmaster required prior permission, he should have sought such by explaining his hazard. Finding that the tow was not properly tightened by the time the tug and tow reached the river,[53] the Court thus finds that Captain Wolfe was negligent in proceeding into the river as he did. Stated another way, the Court is unable to find "that the tug master evaluated his options critically and made a conscious decision that it would be safer" to proceed with the loose tow than to delay his trip slightly in order to ensure no barge was loose.[54]

Similarly, defendants' management itself was negligent in providing Captain Wolfe with a spike barge, at least one without wing wires or other adequate lateral support, for his trip into the high river waters. On the one hand, as Captain Wolfe's observation of "wiggling" and Pilot Roos' description of his brief encounter with the spike barge suggest, the spike barge proved particularly unstable. On the other hand, as the Court infers from Captain Wolfe's dislike of spike barges and from Captain Poe's explanation about the need for secure rigging, the risks and dangers of spike barges, and of travelling on a large river at or near its flood stage, are matters that should be generally known by any competent riverboat company. The Court does not suggest that any company that permits its captains or its boats to push spike barges is negligent per se in all circumstances; however, a company should provide captains with standards for how to exercise their discretion in requiring rerigging and with means to exercise such discretion where warranted. Here, no evidence was presented that defendants' management advised Captain Wolfe about taking any special measures in light of the

Mississippi's high river condition or that it provided him with any means to install wing wires for the spike barge or to guard otherwise against any instability of the spike barge. Had defendants instituted even the most rudimentary rigging standards for their captains to follow or given Captain Wolfe the briefest of reminders about not proceeding on the Mississippi without first ensuring that all tow rigging was secure, then a breakup might well have not occurred.

Adopting Captain Wolfe's opinion that he did nothing wrong, defendants assert that the sole proximate cause of the breakup was the unexpected right-hand draft near the Eads Bridge and that Captain Wolfe's conduct after he encountered this draft was not unreasonable in light of the *in extremis* situation at hand. The Court finds that, as Captain Poe indirectly admitted on cross-examination, Captain Wolfe's conduct after he encountered this draft was reasonable. In this regard, the Court rejects—as being insufficiently established by a preponderance of the evidence, especially in light of this admission by Captain Poe himself—Captain Poe's suggestion that the right-hand draft was wholly a matter of Captain Wolfe's making; as Captain Wolfe agreed, experienced riverboat captains all occasionally encounter unexpected river conditions in areas they have travelled many a time. Were the Court's inquiry limited to this short time and distance before the breakup, the Court might well agree with defendants and hold that they had met their heavy burden; like Captain Wolfe's opinion, however, defendants' argument is too myopic, for it ignores the events in the canal, specifically, the events concerning the loose rigging.[55] The Court

---

**53.** Although the Court rejects such an inference, one might infer that, unknown to Captain Wolfe, the crew in fact did complete its tightening operation. Such an inference, however, would still not defeat a finding that Captain Wolfe was negligent in proceeding into the river as he did. He should have inquired into the status of the rigging; if it was indeed tightened, then he would not have had to proceed under the less stable conditions he thought existed and thus would likely have been able to better manoeuver in the river at a faster (safer) speed.

**54.** See *Employers Insurance of Wausau v. Suwannee River Spa Lines, Inc.,* 866 F.2d 752, 772 (5th Cir.) (citing *Boudoin,* 281 F.2d at 86), *reh'g denied mem.,* 871 F.2d 121 (5th Cir.1989).

**55.** See *Boudoin,* 281 F.2d at 88 (that a hurricane hit did not absolve the defendant from having to establish affirmatively that it had not been negligent). *Contrast Nunley,* 863 F.2d at 1197 (upholding the defense where there was no evidence of separate negligence by the defendant in question).

is unable to find that the right-hand draft was of such a nature that the breakup would have occurred whether or not the STOUT's barges were improperly rigged.[56] As the lack of evidence of any other incidents on the river at that time confirms, this case does not present one of the rare circumstances where the inevitable-accident defense should be upheld.

In sum, the Court finds that defendants have not established that the breakup was inevitable, that human skill and precaution could not have avoided the breakup, or generally that their negligence was not a proximate cause of the breakup. On the contrary, the Court finds that plaintiffs have established by a preponderance of the evidence that defendants' negligence was a proximate cause of the breakup.

2.

■ At the close of plaintiffs' case defendants sought, and now in their posttrial memorandum reurge, an involuntary dismissal on the ground that "plaintiffs failed to prove that defendants owed a duty not to allide with the cell and dolphin." Defen-

dants argue that plaintiffs did not establish that the two structures were not unlawful "obstructions" within the meaning of 33 U.S.C. § 403, which makes it unlawful to "build ... any dolphin ... or other structure in any ... navigable river ... unless the work has been approved by the Army Corps of Engineers." [57]

The Court agrees with defendants that where a violation of the statute is established, the burden-shifting rule described above does not apply, but instead the owner of the offending structure is presumed negligent per se and bears the burden to prove that his negligence was not a proximate cause of the allision.[58] Yet the Court rejects defendants' position for two separate reasons.

First, the mere presence of an object in a navigable river does not necessarily require a finding that the object is in violation of § 403.[59] Certainly, under the express terms of the statute and the Corps regulations thereunder, a structure for which a Corps permit has been issued is sanctioned as a structure lawful under the statute.[60] Contrary to defendants' unsupported pre-

---

**56.** *Cf. City of Boston v. S/S Texaco Texas,* 773 F.2d 1396, 1398 (1st Cir.1985) (upholding finding of no inevitable accident when manned vessel struck bridge, where vessel owner/operator argued that the accident was caused by a "sudden ... unavoidable lateral set").

**57.** *United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1296 (5th Cir.1976); *see* Rivers and Harbors Act of 1899, c. 425, § 10, 30 Stat. 1151, 33 U.S.C. § 403. For the Corps regulations, see 33 C.F.R. pts. 320, 322, 328–330 (1988).

**58.** *Board of Commissioners of the Port of New Orleans v. M/V Agelos Michael,* 390 F.Supp. 1012, 1015 (E.D.La.1974); *American Zinc Co. v. Foster,* 313 F.Supp. 671, 680–81 (S.D.Miss.1970), *modified on other grounds,* 441 F.2d 1100 (5th Cir.) (per curiam), *cert. denied sub nom. Ingalls Shipbuilding Division of Litton Systems, Inc. v. American Zinc Co.,* 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971); *see Dow Chemical Co. v. Dixie Carriers, Inc.,* 463 F.2d 120, 122 n. 4 (5th Cir.), *cert. denied,* 409 U.S. 1040, 93 S.Ct. 525, 34 L.Ed.2d 490 (1972); *see also Petition of Kinsman Transit Co.,* 338 F.2d 708, 718 (2d Cir.1964) (this rule applies to drifting vessels as well), *cert. denied sub nom. Continental Grain Co. v. Buffalo,* 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965).

Even where a structure owner's violation of § 403 is held to be a proximate cause of an

accident, however, a court may still find that negligence of the vessel owner/operator was *also* a proximate cause of the accident. *See Agelos Michael,* 390 F.Supp. at 1016; *Kinsman Transit,* 338 F.2d at 726.

No private cause of action exists for mere violation of the statute. *Testbank,* 752 F.2d at 1031 & n. 15 (citing *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). But the statute does provide a standard of care structure owners owe to vessels. *See Kinsman Transit,* 338 F.2d at 718.

**59.** *See Agri–Trans Corp. v. Gladders Barge Line, Inc.,* 721 F.2d 1005, 1009–10 (5th Cir.1983) (holding that the presence of a sunken barge "undeniably within a navigable channel" of the Mississippi does not, in and of itself, make out a violation of the Rivers and Harbors Act).

**60.** Further, the Corps regulations provide that under certain conditions, no specific permit is needed for certain structures within navigable waters, *see generally* 33 C.F.R. pt. 330, such as "[s]tructures placed within anchorage or fleeting areas to facilitate moorage of vessels where such areas have been established for that purpose by the U.S. Coast Guard," *id.* § 330.5(a)(9). The Court does *not* decide, or have sufficient evidence to decide, whether either of plaintiffs' facilities is an area whose structures come within § 330.5(a)(9).

sumption, the burden of proof that no lawful permit has been issued lies with the person asserting the violation.[61] Thus, violation of the statute is, at most, an affirmative defense for the vessel interests (i.e., defendants) to prove, and the damaged-structure interests (i.e., plaintiffs) need not establish no violation in order to recover for their damages. Because defendants presented no evidence that no permit had been issued or that plaintiffs' structures were otherwise "obstructions" under the law, defendants are entitled to no relief on this point.[62]

Second, regardless of who bears the burden of proof, defendants waived any such defense by not pleading it in their answer or urging it in the pretrial order.[63]

In sum, the Court finds that plaintiffs were in no way contributorily or comparatively negligent in causing the allision.

### E. *Punitive Damages*

 Based upon Captain Poe's testimony that Captain Wolfe's conduct was reckless, plaintiffs seek punitive damages from defendants.

While the Fifth Circuit has not yet ruled on this issue, the Ninth Circuit has held that general maritime law permits the recovery of punitive damages in property damage cases under appropriate circumstances.[64] This Court does not decide whether it should follow the Ninth Circuit, for this case does not present such "appropriate circumstances."

The opinion of Captain Poe, as the sole expert to testify about Captain Wolfe's conduct relative to the standard a prudent mariner would have applied, is entitled to some deference. Yet the Court does not find Captain Wolfe's conduct as egregious as Captain Poe's use of the word "reckless" might imply. Captain Wolfe's misjudgment about the sufficiency of his rigging was just that, a misjudgment. The Court cannot infer that Captain Wolfe intentionally or recklessly proceeded with the knowledge or disregard that his tow would break apart merely because he knew his tow was loose. Captain Wolfe thought he

**61.** *See United States v. Commodore Club, Inc.,* 418 F.Supp. 311, 313 (E.D.Mich.1976) (concerning criminal prosecutions); *cf. Agri–Trans,* 721 F.2d at 1009–10 (to recover costs of removing a wreck, the government must make a proper administrative determination that the wreck's presence violates the statute).

**62.** *See also Dow Chemical,* 463 F.2d at 122 (affirming finding that mooring fenders in violation of 33 U.S.C. § 403 did not "cause" collision with barges); *cf. Nunley,* 863 F.2d at 1198 (affirming finding that fleet facility had not violated its Corps permit). Even if defendants had proved a statutory violation of § 403, it remains questionable whether they would still be entitled to a finding that this violation was a proximate cause of the accident. *Cf. id.* at 1197 ("the record indicated that the barges cascading down the Mississippi did not discriminate between barge fleet locations or tiering lengths").

**63.** *Compare Swift v. State Farm Mutual Automobile Insurance Co.,* 796 F.2d 120, 122–23 (5th Cir.1986) (plaintiff not required to present evidence on an element of her claim, where pretrial order contained no mention of this element, as a contested issue or otherwise) *and Har–Win, Inc. v. Consolidated Grain & Barge Co.,* 794 F.2d 985, 988 (5th Cir.1986) (upholding exclusion of evidence concerning affirmative defense not mentioned in pretrial order) *with Shell Oil Co. v. M/T Gilda,* 790 F.2d 1209, 1215 (5th Cir.1986) (plaintiff not required to present evidence on an element of its claim where pretrial order included that element as an uncontested issue). *See also Morris v. Homco International, Inc.,* 853 F.2d 337, 342–43 (5th Cir.1988) (in a nonjury trial, district court erred in relying on an affirmative defense neither pleaded in defendant's answer nor urged in the pretrial order). *See generally Trinity Carton Co. v. Falstaff Brewing Corp.,* 767 F.2d 184, 192 n. 13 (5th Cir.), *reh'g denied mem.,* 775 F.2d 301 (5th Cir. 1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986).

**64.** *Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379, 1385 (9th Cir.1985); *see also The Amiable Nancy,* 16 U.S. (3 Wheat.) 546, 558, 4 L.Ed. 456, 459 (1818) (dictum recommending punitive damage award against tortfeasors who wantonly and wrongfully seized a vessel).

While a Fifth Circuit panel has recently rejected a portion of *Protectus Alpha* on other grounds, *see Matter of P & E Boat Rentals, Inc.,* 872 F.2d 642, 653 (5th Cir.1989) (reversing punitive damage award for outrageous conduct of company's construction foreman, where company "policymaking officials were [un]aware of this practice"), *petitions for reh'g and reh'g en banc filed,* No. 87–3372 (May 25 and 31, 1989), the panel did not purport to address whether or not punitive damages are ever allowable in cases involving solely property damages.

could handle the river and tow conditions. Hindsight has shown him wrong, but punitive damages are not due simply for poor judgment.

Similarly, while defendants' management itself was negligent in not demanding that its captains follow safer procedures concerning tow makeups—in leaving these decisions to each individual captain without further guidelines—there is no evidence that the corporate policymaking officials were aware that Captain Wolfe would proceed with an unsafe tow.[65] Indeed, the record contains no evidence that Captain Wolfe or any other Orgulf captain had ever had an accident before, from loose rigging or otherwise.

Through a *Thomas* letter [66] to plaintiffs' counsel, defense counsel has requested Rule 11 sanctions in having to defend the punitive damages claim. Notwithstanding the conclusion that punitive damages are not due, the Court cannot find plaintiffs' claim to be even remotely violative of Rule 11. Captain Poe's testimony alone makes the claim "well grounded in fact"; in this connection, the Court notes that plaintiffs did not attempt to assert the claim until after they received Captain Poe's expert report. The Ninth Circuit case referred to above and on which plaintiffs rely shows

the claim is, at a minimum, "warranted by a good faith argument for the extension, modification, or reversal of existing law"; while a Fifth Circuit panel has partially rejected this Ninth Circuit opinion, the panel issued its opinion after the trial in this matter, mandate has not yet issued in the Fifth Circuit case inasmuch as timely petitions for rehearing have yet to be ruled on,[67] and the Supreme Court has not resolved this newly-created conflict.

### F. *Actual Damages*

Under general maritime law, "where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good a position pecuniarily as if his property had not been destroyed." [68]

When the costs of repairs to damaged property exceed the precasualty value of the property, the property is considered to be a "constructive total loss";[69] when the property is damaged beyond physical repair, it is considered an "actual total loss." [70] In either case, the measure of damages is generally the market value of the property just before the loss (less the value of any salved equipment or materials) [71] and does not include loss of use or other consequential damages.[72]

---

**65.** See *P & E Boat*, 872 F.2d at 652–53. *Contrast Complaint of Cameron Boat Rentals, Inc.*, 683 F.Supp. 577, 585 (W.D.La.1988) (hiring pilots "ignorant of radar fundamentals" warranted punitive damages against the employer).

**66.** See *Thomas v. Capital Security Services, Inc.*, 836 F.2d 866, 879–81 (5th Cir.1988) (en banc) (requiring prompt notice of violations to mitigate damages).

**67.** See F.R.App.P. 41(a) (on issuance of mandate).

**68.** *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 155, 45 S.Ct. 465, 466, 69 L.Ed. 890 (1925) (concerning a vessel, but characterizing the rule as "fundamental in the law of damages").

**69.** *Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.*, 792 F.2d 489, 491 (5th Cir.1986) (barge). While the same as the English marine insurance rule, this tort rule differs from the American marine insurance rule that property is a constructive total loss for hull insurance purposes when the costs of repair or recovery

exceed only one-half of its pre-casualty value. See *Cummins Sales & Service, Inc. v. London & Overseas Insurance Co.*, 476 F.2d 498, 502 (5th Cir.), *reh'g denied mem.*, 478 F.2d 1402 (5th Cir.), *cert. denied sub nom. Deutsche Dampfschiff. Ges. "Hansa" v. Cummins Sales & Service, Inc.*, 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973).

**70.** See G. Gilmore & C. Black, *The Law of Admiralty* § 2–14, at 83 (2d ed. 1975).

**71.** *B & M Towing*, 258 F.2d at 475 (same rule applies equally to actual or constructive total loss of vessel); *see King Fisher Marine Service, Inc. v. N/P Sunbonnet*, 724 F.2d 1181, 1185 (5th Cir.) (concerning barge that sunk and was never recovered), *reh'g denied*, 729 F.2d 315 (5th Cir. 1984) (per curiam); *Orange Beach Water, Sewer & Fire Protection Authority v. M/V Alva*, 680 F.2d 1374, 1383 (11th Cir.1982) (applying rule of *B & M Towing* to damaged pipeline that was actual total loss from allision).

**72.** *Albany Insurance Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 253 (5th Cir.1988) (concerning a

■ "Where there are insufficient sales to establish a market other evidence such as replacement cost, depreciation, expert opinion and the amount of insurance can also be considered to determine the value of the lost [property]."[73] Where the owner had used the property for a special use or where there otherwise may be no true market, replacement costs may be the most accurate basis for determining damages,[74] which are recoverable whether or not the property is repaired or replaced.[75]

■ Under the new-for-old rule, "a party suffering injury may recover only that which is necessary to restore his damaged property to the same condition as existed immediately prior to the delict."[76] Thus, where repair or replacement costs form the basis of the damage award, the Court must determine whether the repair or replacement adds new value to or extends the useful life of the property;[77] if so, an appropriate reduction from the full repair or replacement costs should be made.[78] In this regard, the Court must typically determine what the expected useful life of the property was just prior to the casualty, what the expected useful life of the repaired or replaced property would be, and what amount should be reduced from an award in order to account for any prior depreciation or any anticipated betterment.

barge that was a total constructive loss) (citing *King Fisher,* 724 F.2d at 1186–87 & n. 2 (barge was total actual loss)); *Ryan Walsh,* 792 F.2d at 491 (upholding finding that a barge was not a constructive total loss).

73. *King Fisher,* 724 F.2d at 1185 (citing *Carl Sawyer, Inc. v. Poor,* 180 F.2d 962, 963 (5th Cir.1950) ("where no market value has been established by recent and comparable sales other evidence is admissible touching value such as the opinion of marine surveyors, engineers, the cost of reproduction, less depreciation, the condition of repair which the vessel was in, the uses to which it can be put, the amount of insurance that the underwriters have issued, and the like")); *Orange Beach,* 680 F.2d at 1384 (quotation in *Carl Sawyer* applies equally to damaged fixed structures).

74. *See King Fisher,* 724 F.2d at 1185–87 (affirming award of $230,000 for loss of barge that plaintiff had both bought and replaced at $30,-000 and used as a drydock platform, where plaintiff had repaired and modified the new barge for an additional $200,000 in order to use it as the new drydock platform), *reh'g denied,* 729 F.2d at 316; *Freeport Sulphur Co. v. S/S Hermosa,* 526 F.2d 300, 304 (5th Cir.1976) ("When there is tortious injury to property and the market value of that property is unknown, the amount of damages must be determined by the cost of repairs to the property.") (concerning dock damage).

75. *See Bunge Corp. v. American Commercial Barge Line Co.,* 630 F.2d 1236, 1242 (7th Cir. 1980) (affirming award for damage to dolphin by errant barges, where "plaintiff had constructed a new facility rather than restored the old one"). The same rule applies to partial losses. *See United Overseas Export Lines, Inc. v. Medluck Compania Maviera [sic], S.A.,* 785 F.2d 1320, 1327 (5th Cir.1986) (damaged vessel sold for scrap) (quoting *The Tug June S v. Bordagain*

*Shipping Co.,* 418 F.2d 306, 307 (5th Cir.1969) (same)).

76. *City of New Orleans,* 662 F.2d at 1124 (citing *Elaine Jones,* 480 F.2d at 27).

77. *Elaine Jones,* 480 F.2d at 27 (upholding no reduction for depreciation, where district court found an indefinite useful life of plaintiff's bridge); *see Freeport Sulphur,* 526 F.2d at 304.

78. Citing Justice Story's dictum in *Bradlie v. Maryland Insurance Co.,* 37 U.S. (12 Pet.) 378, 399, 9 L.Ed. 1123, 1132 (1838) ("[There is an] ordinary deduction in cases of a partial loss of one third new for old, from the repairs.... That rule supposes the vessel to be repaired and returned to the owner; who receives a corresponding benefit from the repairs beyond his loss, to the amount of one third."), defendants argue that they are "entitled to a one-third credit for betterment, as a matter of law." To the extent defendants argue anything more than the general rule that an "appropriate" deduction for depreciation should be taken, the citation is misplaced. First, the dictum concerned computation of payments under old marine hull insurance policies that contained what appears to be a crude provision to account for depreciation. *Cf.* Laws of Oléron, art. XIV (ca. 1266) ("If a vessel, being moored, lying at anchor, be struck ... the whole damage shall be in common, and be equally divided and appraised half by half.... The reason why this judgment was first given, being, that an old decayed vessel might not purposely be put in the way of a better...."), *reprinted in* 30 F.Cas. 1171, 1187 (1897). Second, to the extent that the dictum purported to apply to noninsurance, tort collision cases, it is clear that the Supreme Court as well as every circuit court has since implicitly rejected this single, approximate, bright-line method for accounting for depreciation. *See, e.g., Freeport Sulphur,* 526 F.2d at 304 n. 5. Finally, and perhaps most importantly, Justice Story elsewhere explicitly stated that this one-

While a linear, or straight line, depreciation method is most commonly used for property with a fixed life span,[79] this method is not to be applied where evidence establishes that the original property had been deteriorating at a nonlinear rate.[80] Similarly, if there is no evidence of any deterioration prior to the casualty, then no deduction is made for depreciation.[81]

Noting that these general rules apply not only to vessels but also to fixed structures such as plaintiffs' two,[82] the Court now turns to the three categories of damages sought.

### 1. *The cell*

There is no dispute that the cell should not and cannot be used in its present condition for the same purpose to which it had previously been put. As defendants concede in their posttrial memorandum, the cell is a total loss. Yet damage to these two structures has not affected the volume of business that each facility can handle.

The parties dispute whether the "property" to which the above rules apply consists of just the cell itself or instead the entire ICG/Peabody facility. The Court need not resolve this dispute, for the result is the same in either case, where as here plaintiffs have consistently maintained that they are not seeking any loss-of-use or other consequential damage claim.

■ There is no apparent dispute that no general, trading market exists for a cell such as plaintiffs' or that the cell was, and similar cells typically are, not separately insured from the overall facility of which it was but a small part. In any event, there was no evidence to the contrary, and the Court reasonably infers that the sole way a company not itself in the construction business may obtain such a cell is to hire an engineer to design one and then a contractor to execute the design. In other words, the Court finds that replacement costs are the best indicia of "market value." Thus, the Court must determine what the reasonable replacement costs for the cell should be and what amount, if any, should be deducted therefrom for depreciation. The parties dispute both issues.

■ For two general reasons, the Court finds Massman's bid of $176,500 to be the figure established by a preponderance of the evidence as being the most reasonable estimate of actual construction costs for a new cell.

First, the Court finds by a preponderance of the evidence that Campbell Design's specifications for the new cell—a 20–foot diameter cell surrounding the remnants of the present cell—are the most reasonable to provide plaintiffs with a new cell of a function and utility most comparable to the present cell. On the one hand, the evidence was uncontradicted that a cell of the same or smaller size could not be placed in the same location, that a 20–foot cell was the next available and cheapest size possible for the same location, and that a 20–foot cell would provide plaintiffs with no greater use than did the present cell. On the other hand, Weis' suggestion that a new cell could be placed slightly downstream of the present cell fails to adequately consider that between this and the adjacent cell, plaintiffs use barges primarily, if not exclusively, 195 feet long; specifically, Weis failed to explain (1) how any barge longer than about 177 feet could fit between the two cells if a new cell were placed directly downstream of the existing cell, (2) how a cell further upstream than the present cell could safely hold 195–foot barges, or (3) how and if a cell could be

third rule did not apply in total loss cases. *See* 37 U.S. (12 Pet.) at 399, 9 L.Ed. at 1132.

**79.** *See Freeport Sulphur,* 526 F.2d at 304–05. Where the repaired or replaced structure is expected to have a useful life different from that of the original structure at the time it was acquired, then the denominator for the straight-line method is to be the expected useful life of the new structure, and not the expected useful life of the old structure. *Id.* at 306.

**80.** *See Orange Beach,* 680 F.2d at 1384 (reversing damage award and remanding, where district court used straight-line depreciation and evidence showed a faster rate of deterioration).

**81.** *See City of New Orleans,* 662 F.2d at 1124 (affirming no deduction for depreciation to steel fenders attached to a dolphin).

**82.** *See* T. Schoenbaum, *Admiralty and Maritime Law* § 13–5, at 466 (1987).

used if it were placed to the side contrary to positioning of all the other cells. Further, the Court rejects Weis' suggestion that the old cell may be cutoff at some point significantly above the mud-line. On the one hand, under this suggestion, the granular fill inside the cell would not, for this distance, press against the new, outer cell. On the other hand, as Lodewyck attested and the bid package specifications imply, the fill is used to provide necessary stability and support to the cell. Thus, it is difficult to understand how the fill could provide such stability and support if it were unable to press against the outer cell. Further, Weis' suggestion appears not to consider the significant leaning of the present cell; in other words, it does not explain how a new cell could surround the present, tilted cell and still stand sufficiently erect.

Second, Pillsbury appears to have followed the accepted industry practice for obtaining the most reasonable bid for executing Campbell Design's specifications for a new cell. Nothing in the bid package or in the communications made to any of the potential contractors before any bids were submitted suggests otherwise. Thus, the Court gives little effect to defendants' observation that the bid was never actually accepted. Lodewyck amply illustrated the unreasonableness of Weis' suggestion that the job can be done cheaper if land-based equipment is used; further, no evidence suggests that any cell has ever been built with wholly land-based equipment or that any contractor has demonstrated a willingness to construct a new cell in such a fashion, even in the lowest of waters. In this regard, the Court emphasizes that the bid package placed no restrictions against the use of land-based equipment. In sum, the Court rejects Weis' unsubstantiated "estimate" over Massman's competitive bid.

Plaintiffs concede, and defendants appear not to dispute, that the cell had an expected useful life of 40 years. Noting the corroborative evidence concerning other cells at the ICG/Peabody facility, the Court accepts this figure. Both experts appear to infer that a new cell would have the same expected useful life as did the present cell when it was installed and that depreciation of a cell is generally on a linear basis; likewise, the Court accepts the inference.

Despite such uncontradicted evidence, both sides still dispute what amount should be deducted for depreciation. Plaintiffs argue none, while defendants argue $9/40$ths. The Court rejects both positions and instead deducts $26,475 (i.e., $6/40$ths, or 15%) for depreciation from the time of installation in 1980 to the time of the casualty in 1986.

On the one hand, defendants argue without authority that depreciation should be calculated over a nine-year period (1980 to 1989) instead of over a six-year period on grounds that plaintiffs are still using, or "consuming," the cell. The Court need not determine the merits of defendants' legal position, for the Court rejects their characterization of the facts upon which their position relies, namely, that the cell is still in full or even partial use. While defendants' two experts testified that they had seen what appeared to be barges near the cell on isolated occasions last winter, the Court cannot conclude by a preponderance of the evidence that plaintiffs have been regularly using this cell. First, both witnesses admitted that their vantage points were from far away; neither testified that he could actually see lines extending from any barge to the cell. Second, one of these very witnesses, Weis, indirectly but candidly admitted that the cell could not and should not be used for its intended purpose —that the cell as damaged lacked the desired structural integrity. Finally, despite their work around the cell, none of the several other witnesses, some of whom no longer have any ties with plaintiffs, testified similarly.

On the other hand, plaintiffs argue that no deduction should be taken because under the lease with ICG and Burlington Northern, Pillsbury was (and ConAgra now is) contractually obligated at the end of the lease to return the facility, including the cell, to its former, pre-lease condition. This position not only ignores the rule mentioned above that a defendant is not to be

required to pay for any betterments through repair or reconstruction, but also ignores the "reasonable wear and tear excepted" language in the lease. The Court recognizes that it may be impractical or even impossible to replace the cell with another whose useful life does not extend beyond the present cell's original expected useful life and that Pillsbury (and ConAgra) may receive no benefit from any extension of useful life beyond the term of the lease for the ICG/Peabody facility.[83] But the law of this circuit affords no relief under such circumstances. On the one hand, it would appear that persons in defendants' position have no duty to foresee that damage to a fixed structure such as the cell would cause economic loss to an extent greater than and different from what would be recoverable by an owner of the cell.[84] On the other hand, this particular damage to Pillsbury and ConAgra—the present value of the difference in the computed value at the expiration of the lease between (1) the remaining anticipated useful life in the new cell and (2) the remaining anticipated useful life of the present cell had there been no allision—is nonrecovera-

ble under *Testbank*[85] because such damage is separate from any proprietary interest either may hold in the cell.[86]

In sum, subtracting $26,475 from $176,500, the Court holds that plaintiffs should be awarded $150,025.00 for the cost of construction to replace the cell.

## 2. *The dolphin*

There is no dispute that the dolphin cannot be used in its present condition, has not been used since the allision, and should be replaced in order to have a dolphin of the same structural integrity as existed before the allision. Further, there is no dispute that there is no general market for dolphins such as used at the Pillsbury Sauget facility or that Massman's figure of $119,800 is a reasonable figure for the construction cost to replace the dolphin.

As with the cell, both experts appear to infer that a new dolphin would have the same expected useful life as did the present dolphin when it was installed and that depreciation of the dolphin is generally on a linear basis; likewise, the Court accepts the inference, which is stronger here inasmuch as Campbell Design's specifica-

---

**83.** The Court intimates no opinion whether Pillsbury or ConAgra might have a quantum meruit or similar-type claim against ICG and Burlington Northern upon expiration of the lease for any extension of the cell's useful life beyond the term of the lease.

**84.** *See Complaint of Lloyd's Leasing Ltd.,* 868 F.2d 1447, 1449 (5th Cir.) (per curiam) (citing *Consolidated Aluminum Corp. v. C.F. Bean Corp. [Bean II],* 833 F.2d 65, 67–68 (5th Cir.1987), *reh'g denied mem.,* 837 F.2d 1090 (5th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 2821, 100 L.Ed. 2d 922 (1988)), *reh'g denied mem.,* 875 F.2d 858 (5th Cir.1989).

**85.** *State of Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019, 1022–23 (5th Cir.1985) (en banc) (interpreting *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927)) (general maritime law recognizes "no recovery for economic loss absent physical injury to a proprietary interest"), *cert. denied sub nom. White v. M/V Testbank,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

**86.** *See Cargill, Inc. v. Doxford & Sunderland, Ltd.,* 782 F.2d 496, 498–99 (5th Cir.), *reh'g denied,* 785 F.2d 1296, 1297–98 (5th Cir.1986) (per curiam). *Compare Bean II,* 833 F.2d at 67–68

(damage to plaintiff's property was unforeseeable) *with Bean I,* 772 F.2d 1217 (5th Cir.1985) (plaintiff had sustained damages to its proprietary interest). While Judge Williams writing alone has suggested that "the common legal synonym for 'proprietary interest' is 'ownership,'" *see Testbank,* 752 F.2d at 1034 (Williams, J., concurring), Fifth Circuit panels subsequent to *Testbank* have not been so narrow and would appear to extend proprietary interest status to lessees, such as Pillsbury and ConAgra, who hold exclusive possessory right to use and control the property in question and owe a contractual duty to the owners to repair such property. *See Bosnor, S.A. de C.V. v. Tug L.A. Barrios,* 796 F.2d 776, 783 (5th Cir.) (bareboat charterer had proprietary interest in vessel chartered), *reh'g denied mem.,* 803 F.2d 717 (5th Cir.1986); *see also Texas Eastern Transmission Corp. v. McMoRan Offshore Exploration Co.,* 877 F.2d 1214, 1224–26 (5th Cir.) (contrasting *Louisville & Nashville Railroad Co. v. M/V Bayou Lacombe,* 597 F.2d 469 (5th Cir.1979) (finding no such interest where plaintiff had a nonexclusive right to use the property at issue) to *Domar Ocean Transportation, Ltd. v. M/V Andrew Martin,* 754 F.2d 616, 618–19 (5th Cir.1985) (finding that plaintiff had proprietary interest in integrated tug/barge system where it owned tug and leased barge)), *reh'g denied,* 877 F.2d at 1229, *further reh'g denied,* 877 F.2d at 1230 (5th Cir. 1989).

tions for the new dolphin were essentially identical to the specifications for the present dolphin. The parties dispute, however, what this expected useful life is: Lodewyck states it is 40 years, while Weis states it is 20 years.

Neither expert explained in any detail the basis of his figure or why he believed his figure was more accurate than the other expert's. The Court nonetheless observes certain points. On the one hand, Lodewyck was more hesitant about his estimate for the dolphin than he was for the cell because of the greater stress points on the angular-shaped dolphin, but advised that his estimate specifically took account of these special characteristics of the steel shapes used in the dolphin. On the other hand, Weis pointed to no specific evidence of (noncollision-related) deterioration to the dolphin. Considering the weakness and uncertainty of each expert's opinion, the Court finds that the present dolphin had, and the proposed dolphin will have, an expected useful life of thirty years.

Despite the lack of precise evidence on this point, a preponderance of the evidence suggests that the present dolphin was built in 1984. There is, however, no evidence of exactly when in 1984 it was built. The Court finds that the dolphin had been in use for two years before the collision. Thus, the Court finds that the $119,800 award for the dolphin's replacement costs should be reduced by 2/30th, or $7986.67, in order to account for prior depreciation.

In sum, the Court holds that plaintiffs should be awarded $111,813.33 for the construction costs to replace the dolphin.

### 3. *Incidental charges*

■ Plaintiffs also seek certain incidental costs totalling $25,688. Defendants contest these amounts as being nonrecoverable litigation expenses.

Were there a general, trading market for the structures at issue such that the Court would not have to resort to replacement costs as the appropriate measure for determining "market value," the Court might well agree with defendants that these incidental costs are nonrecoverable. As already explained, however, such is not the case.

Engineering and surveying costs are as necessary and integral a part of replacement costs as are a contractor's construction costs.[87] Without this preliminary work, a contractor is unable to perform, for he has no plan to follow. Thus, to the extent they are reasonable, these incidental costs are recoverable. Nor is it a valid defense as to the costs allocable to the cell that someone other than the owners has incurred or may incur these costs through a contractual arrangement with the owners.[88]

There is no evidence that any of the amounts already spent are unreasonable or unnecessary; thus, they should be awarded. While Pillsbury has yet to pay Campbell Design a remaining $6930, the evidence was uncontradicted that Pillsbury is contractually obligated to pay this remaining portion of the liquidated fee for Campbell Design's past and future work on the structures, regardless of whether plaintiffs undertake any construction or not, and there is no evidence that this arrangement is unreasonable; thus, this amount should be awarded as well.

While plaintiffs indirectly suggest that no depreciation deduction should be taken for these amount, and while the Court has found no cases addressing this exact issue,[89] the Court believes the better rule would apply such deductions. Like the construction costs, these costs help provide

---

**87.** See *Freeport Sulphur*, 526 F.2d at 303–04. See generally T. Schoenbaum, *supra* note 82, § 13–5, at 465.

**88.** See *Amoco Transport Co. v. S/S Mason Lykes*, 768 F.2d 659, 668 (5th Cir.1985). This situation most typically occurs in the insurance context, where a property insurer pays off a claim by its insured and then pursues in its own behalf through conventional subrogation any claim the insured might have had against a third-party tortfeasor.

**89.** Without discussion of this issue, at least one court has taken no deduction for these amounts. See *American Oil Co. v. M/T Lacon*, 398 F.Supp. 1181, 1195 (S.D.Ga.1973), *aff'd without published opinion*, 518 F.2d 1405 (5th Cir.1974).

plaintiffs with two structures that will presumably have useful lives that extend further into the future than would have the two present structures without the allisions; defendants should not have to pay for this slight extra benefit. Thus, the Court takes an appropriate depreciation deduction from these costs just as from the actual construction costs.

Because the depreciation taken on the two structures is at different ratios, the Court must allocate these incidental costs between the two and deduct the appropriate depreciation factor from each allocation. These costs are allocable as follows:

| Description | The dolphin | The cell |
|---|---|---|
| Cairo Marine ($567) | $ 283.50 | $ 283.50 |
| Able Marine Divers ($516) | 258.00 | 258.00 |
| American Commercial Marine | | 661.25 |
| Louisiana Dry Dock Co. | | 143.75 |
| Campbell Design Group ($23,800) | 11,900.00 | 11,900.00 |
| | | |
| Gross Total: | $12,441.50 | $13,246.50 |
| | | |
| (depreciation ratio: 2/30) | (829.43) | |
| (depreciation ratio: 6/40) | | (1,986.98) |
| | | |
| NET TOTAL | $11,612.07 | $11,259.52 |

In sum, the Court holds that plaintiffs should be awarded $22,871.59 for incidental costs from damage to the two structures.

### G. *Prejudgment Interest*

■ Plaintiff urges the Court to award prejudgment interest from the date of loss at the Louisiana statutory rate. Defendants do not dispute the rate suggested, but dispute whether any prejudgment interest should be awarded.

The rules on prejudgment interest in admiralty property damage cases are well-settled. As the Fifth Circuit has stated:

We start from the bedrock premise that an award for prejudgment interest in actions under the general maritime law is the rule rather than the exception; prejudgment interest must be awarded unless unusual circumstances make an award inequitable.... Similarly, this circuit has consistently held that prejudgment interest on repair costs runs from the date of the accident even though the owner does not pay these costs until some later date.[90]

These rules apply even where the plaintiff never replaces or repairs its damaged structure.[91] To objections that this rules condones double recoveries, the Fifth Circuit has explained that prejudgment "[i]nterest is awarded not as a penalty or as compensation for loss of property use, but as compensation for the use of funds to which the plaintiff was ultimately judged entitled, but which the defendant had the use of prior to judgment."[92]

The Fifth Circuit has narrowly[93] prescribed what may constitute "unusual circumstances" to justify this Court in exercising its discretion to deny or limit prejudgment interest.

Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff.[94]

Admittedly, as the cases cited by defendants show, the rule appears slightly different for personal injury claims, where prejudgment interest is not allowed on future damages (viz., future medical, future pain and suffering, and loss of future wages). *See, e.g., Verdin v. C & B Boat Co.,* 860 F.2d 150, 158 (5th Cir.), *reh'g denied mem.,* 862 F.2d 874 (5th Cir.1988).

---

**90.** *Ryan Walsh,* 792 F.2d at 492–93 (citations omitted).

**91.** *See Bunge,* 630 F.2d at 1242–43 (reversing denial of prejudgment interest, where plaintiff never replaced or repaired its damaged dolphin); *cf. United States v. Central Gulf Lines, Inc.,* 747 F.2d 315, 320 (5th Cir.1984) (upholding award of prejudgment interest for cargo loss, where government agency never replaced the cargo). This Fifth Circuit rule differs from the rule in some other circuits. *See American Oil,* 398 F.Supp. at 1196.

**92.** *Ryan Walsh,* 792 F.2d at 493 (citation omitted); *see King Fisher,* 724 F.2d at 1187 (citing further cases).

**93.** *Nunley,* 863 F.2d at 1204.

**94.** *Reeled Tubing, Inc. v. M/V Chad G,* 794 F.2d 1026, 1028 (5th Cir.1986).

Deferral of repairs, however, does not constitute such a circumstance.[95]

This case presents none of these peculiar circumstances. First, there is no evidence that plaintiffs improperly delayed in notifying defendants of their claim, in filing suit, or in prosecuting their suit. Pillsbury notified defendants the day following the accident, invited them to all surveys, asked defendants if they wished Pillsbury to seek bids from any other contractors other than those already chosen by Campbell Design, attempted to negotiate a settlement soon after the bids were received, and promptly filed suit within two weeks after the unsuccessful negotiation meeting.[96] The Court must reject defendants' characterization of slight delays from extensions in discovery as being "the fault of plaintiff's counsel."[97] While a conflict in the Court's calendar caused the initial trial date of April 10, 1989 to be continued, the delay till the new trial date was for a mere 2½ weeks. Second, this case was simply not one "in a mutual fault setting." There was absolutely no evidence that plaintiffs were in any respect negligent; further, while the Court does not find defense counsel's refusal to stipulate liability to have been violative of Rules 11 and 16, the Court remarks that his arguments against liability were most weak.[98] Third, the damages awarded ($284,709.92) are in no way "substantially less than the amount claimed;" plaintiffs' initial complaint made a demand for $344,-480, and in the pretrial trial order and their pretrial and posttrial memoranda, they reduced their claim for actual damages to $321,988.[99]

The rate at which prejudgment interest is awarded is within the trial court's "broad discretion."[100] The Fifth Circuit has upheld awards at the Louisiana legal rate,[101]

**95.** *See Ryan Walsh,* 792 F.2d at 493; *In re M/V Vulcan,* 553 F.2d 489, 490 (5th Cir.) (per curiam), *cert. denied sub nom. Sabine Towing & Transportation Co. v. Zapata Ugland Drilling Co.,* 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977); *Gulf Oil Corp. v. Panama Canal Co.,* 481 F.2d 561, 571 (5th Cir.1973); *Mobil Oil Corp. v. Tug Pensacola,* 472 F.2d 1175, 1176 (5th Cir. 1973) (per curiam); *see also Galveston Towing Co. v. Cuban Steamship Co.,* 195 F. 711, 713 (5th Cir.) (modifying interest award to run from date of collision instead of from date of repairs), *reh'g denied,* 199 F. 904 (5th Cir.1912).

**96.** *Compare Reeled Tubing,* 794 F.2d at 1028 (reversing denial of prejudgment interest, where plaintiff had filed its suit a year after the loss) *and Inland Oil & Transport Co. v. Ark–White Towing,* 696 F.2d 321, 327–28 (5th Cir.1983) (this factor did not apply where plaintiff filed suit eight months after accident and judgment was not rendered until almost four years after accident) *with Mecom v. Levingston Shipbuilding Co.,* 622 F.2d 1209, 1217 (5th Cir.1980) (upholding denial of interest, where plaintiff filed suit 2⅔ years after barge sank).

**97.** The Court notes defense counsel's general and apparent reluctance in being accommodating. To quote the Fifth Circuit: "counsel might well have observed the courtesy of a bygone day that is still, fortunately, practiced by some members of our profession." *Sun Bank of Ocala v. Pelican Homestead & Savings Ass'n,* 874 F.2d 274, 277 (5th Cir.1989).

**98.** *See Reeled Tubing,* 794 F.2d at 1029; *cf. Gator Marine Service Towing, Inc. v. J. Ray McDer-*

*mott & Co.,* 651 F.2d 1096, 1100–01 (5th Cir. Unit A 1981) (affirming award, where district court found 40%/60% mutual fault). *Contrast Inland Oil,* 696 F.2d at 328–29.

**99.** *See Inland Oil,* 696 F.2d at 328 (complaint's demand of $85,000 was "an amount not disproportionately greater than" the award of $30,-000); *cf. Nunley,* 863 F.2d at 1204 (directing the district court to award prejudgment interest on a claim upheld, even though that claim and the claim reversed were together arguably for "a significantly larger amount").

**100.** *E.g., Reeled Tubing,* 794 F.2d at 1029.

**101.** *See Zim Israel Navigation Co. v. Special Carriers, Inc.,* 800 F.2d 1392, 1394–95 (5th Cir. 1986) (per curiam); *Transorient Navigators Co. v. M/S Southwind,* 788 F.2d 288, 293 (5th Cir. 1986); *Domar Ocean,* 754 F.2d at 621; *Todd Shipyards Corp. v. Auto Transportation, S.A.,* 763 F.2d 745, 753 (5th Cir.), *reh'g denied mem.,* 770 F.2d 164 (5th Cir.1985).

Prior to the 1982 amendment to 28 U.S.C. § 1961, federal legal postjudgment interest was "calculated . . . at the rate allowed by State law." The Fifth Circuit had similarly upheld awards using these rates. *See Signal Oil & Gas Co. v. Barge W–701,* 654 F.2d 1164, 1176 (5th Cir. Unit A 1981) (affirming over objection that trial court should have used plaintiff's cost of borrowing), *certs. denied sub nom. J. Ray McDermott & Co. v. Signal Oil & Gas Co.,* 455 U.S. 944, 102 S.Ct. 1440–41, 71 L.Ed.2d 656 (1982); *Geotechnical Corp. of Delaware v. Pure Oil Co.,* 214 F.2d 476, 478 (5th Cir.1954).

at the federal legal rate,[102] as well as at, among other rates,[103] higher rates roughly equal to the plaintiff's actual cost of borrowing.[104] In cases where there was no evidence that the plaintiff had actually borrowed money and incurred higher interest costs, the Fifth Circuit has uniformly rejected plaintiffs' argument that they should have been awarded prejudgment at the generally higher cost-of-borrowing rate.[105] Further, the Fifth Circuit has rejected objections, from both plaintiffs and defendants, for awarding interest at a rate different from a state legal rate.[106]

In this case, plaintiffs have introduced no evidence that they borrowed money, or were prevented from paying off loans, because of this action. Recalling the articulated purpose of prejudgment interest awards, the Court observes that the federal legal rate is tied to rates of investment return,[107] whereas the Louisiana legal rate is tied to the generally higher rates of borrowing.[108] Further, the Court observes that plaintiffs' choice of Louisiana state law should be entitled to less weight here, where the cause of action arose outside of Louisiana and none of parties appears to be incorporated or have its principal place of business within Louisiana; Louisiana is but plaintiffs' choice of forum.

In the exercise of its discretion, the Court determines that prejudgment interest should be awarded from the date of the casualty (viz., October 28, 1986) at the current rate provided for in 28 U.S.C. § 1961 (viz., 8.85% compounded annually).

### III.

For these reasons, the Court shall forthwith enter judgment (1) in favor of all plaintiffs and against defendants Midland and Orgulf in the amount of $284,709.92 together with interest from October 28, 1986 until paid at the current rate provided for in 28 U.S.C. § 1961 and (2) dismissing without prejudice plaintiffs' *in rem* claim against the ROBERT N. STOUT. Defendants shall bear all costs.

### JUDGMENT

Considering the Court's Opinion in this matter,

---

**102.** *See Reeled Tubing,* 794 F.2d at 1029.

**103.** *See, e.g., Bosnor,* 796 F.2d at 786–87; *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel,* 695 F.2d 893, 906–07 (5th Cir.), *cert. denied sub nom. State of Texas v. Platoro Ltd., Inc.,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Gator Marine,* 651 F.2d at 1100–01.

**104.** *See Vulcan,* 553 F.2d at 491.

**105.** *See Bosnor,* 796 F.2d at 786–87 (affirming award at 11%, where the average interest rate for 3–month T-bills was 11.125% and the average daily prime lending rate was 15.45%); *Todd Shipyards,* 763 F.2d at 753 (affirming prejudgment interest award at state rate but to be compounded daily "to approximate roughly the rate of return [plaintiff] could have received"); *Domar Ocean,* 754 F.2d at 621; *Signal Oil,* 654 F.2d at 1176–77; *Gator Marine,* 651 F.2d at 1100–01.

**106.** *Compare Platoro Ltd.,* 695 F.2d at 907 (affirming award at 9% over the Texas rate of 6%) *with Reeled Tubing,* 794 F.2d at 1029 (affirming award at the federal rate, which was lower than the Louisiana state rate). *Cf. Transorient,* 788 F.2d at 293 (finding no abuse of discretion in awarding state legal interest to be compounded daily (following *Todd Shipyards,* 763 F.2d at 753)).

Conversely, the Fifth Circuit has upheld an award at the state rate, where defendant argued that the lower federal rate should have been applied. *See Zim Israel,* 800 F.2d at 1394–95.

**107.** *See* 28 U.S.C. § 1961. The federal legal rate for a particular date is "calculated ... at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date" in question. *Id.* For the period since October 28, 1986, the rate has changed 34 times from a low of 5.75% to a high of 9.51%. Since June 1, 1989, the rate has been at 8.85%.

**108.** The provisions for fixing the Louisiana legal rate are set forth in La.Civil Code art. 2924. From September 11, 1981 to December 31, 1987, the rate was a fixed 12%. *See id.* art. 2924(B)(2)(c). Since 1988, however, this legal rate has been annually set at one percent above the average prime lending rate for five of the nation's largest banks on the first workday of the prior December. *See id.* art. 2924(B)(3)(a). For the year 1988, the rate was 9.75%. *See* 14 La.Reg. 4 (Jan. 20, 1988). For the year 1989, the rate is 11.5%. *See* 14 La.Reg. 844 (Dec. 20, 1988).

IT IS HEREBY ADJUDGED, OR-DERED, AND DECREED that there be judgment in favor of all plaintiffs (The Pillsbury Company, Illinois Central Gulf Railroad Company, Burlington Northern Railroad Company, and ConAgra, Inc.) and against defendants Midland Enterprises, Inc. and Orgulf Transport Company jointly, severally, and *in solido* in the amount of $284,709.92 together with interest from October 28, 1986 until paid at the rate provided for in 28 U.S.C. § 1961; these two defendants to bear all costs in this matter.

IT IS HEREBY FURTHER AD-JUDGED, ORDERED, AND DECREED that there be judgment against all plaintiffs and in favor of defendant the M/V ROBERT N. STOUT *in rem*, dismissing plaintiffs' claim against it without prejudice for lack of *in rem* jurisdiction.

New Orleans, Louisiana, this 21st day of June, 1989.